UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

3:21-CV-178
Corker / Guyton
FILED

MAY 1 2 2021

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

R.S. LOGISTICAL SOLUTIONS LTD,

    Plaintiff,

    v.

JANUS GLOBAL OPERATIONS, LLC, and
CALIBURN INTERNATIONAL, LLC,

    Defendants.

Case No. 21-CV-XXXX

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff, R.S. Logistical Solutions LTD ("Plaintiff" or "RSLS"), by and through its undersigned counsel, hereby brings this action against Defendants Janus Global Operations, LLC ("JGO") and Caliburn International, LLC ("Caliburn") (collectively, "Defendants") and allege as follows:

## INTRODUCTION

1.    Plaintiff RSLS provides logistics and specialized mission support services to U.S. federal agencies and military forces operating in volatile areas throughout the developing world, services depended upon by thousands of diplomatic, security and medical personnel deployed by or on behalf of the U.S.

2.    RSLS's unique capabilities are the result of ten years of significant investments in acquiring the localized know-how, cultural expertise, relational networks and legal authorizations and permits needed to operate in foreign jurisdictions under austere conditions. These operational infrastructures, built through the diligent cultivating and stewarding of trust, enable RSLS to

1

submit cost-effective subcontractor bids that give prime contractors a competitive advantage in competing for well-paying government task orders—advantages enjoyed by Defendants in JGO's winning of a significant task order in 2019 to support the U.S. Department of State's ("DOS") activities in Somalia.

3. However, after and while enjoying the material financial benefits of its business relationship with RSLS, Defendants disregarded JGO's contractual commitments and legal obligations to RSLS and sought to obscure their actions for as long as possible in order to avoid accountability and continue leveraging their association with RSLS to JGO's and Caliburn's benefit in Somalia and elsewhere, including South Sudan and Israel.

4. RSLS now brings this civil action asserting breach of contract and related tort and equitable claims seeking recovery of damages incurred as a result of Defendants' unlawful actions.

## PARTIES

5. RSLS is a limited liability company formed and headquartered in Israel. RSLS is a provider of logistics and specialized mission and life support services for enterprise clients and government projects, regularly serving as a subcontractor in support of U.S. federal agencies' operations in demanding, high-risk environments.

6. Defendant JGO is a limited liability company formed under the laws of Delaware, with its principal office in Lenoir City, Tennessee. JGO provides mission support and program management services to government agencies operating around the world, including serving as a prime contractor for multiple U.S. federal agency task orders.

7. Defendant Caliburn is a limited liability company formed in April 2018 under the laws of Delaware, with its corporate headquarters in Reston, Virginia. Caliburn is a holding company comprised of five entities, two of which include JGO and Sallyport Global Holdings,

2

Inc. ("Sallyport"). Caliburn describes itself as "a global, end-to-end government services provider."

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over the claims in this Complaint pursuant to 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.    This Court has personal jurisdiction over Defendants because JGO maintains its principal office in Loudon County, Tennessee.

10.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because JGO maintains its principal office in Loudon County, Tennessee.

11.    Moreover, jurisdiction and venue, as well as the application of Tennessee law, are proper pursuant to the forum selection and choice-of-law provisions in the contractual agreement between RSLS and JGO at issue in this dispute and discussed in detail below.

## FACTUAL ALLEGATIONS

### A.    SOMALIA TASK ORDER PROPOSAL, AWARD, AND DEFENSE OF BID PROTEST

12.    In April 2019 DOS issued Request for Proposals No. 19AQMM19R0112 seeking bids for protective guard services, static guard services, and specialized security services to be provided at the U.S. Mission Somalia (the "Somalia RFP"). The Somalia RFP contemplated the issuance of a hybrid fixed-price, cost-reimbursement type task order for a base year and four one-year options ("Somalia Task Order").

13.    Among the Somalia RFP's requirements was the provision of a secure residential compound and associated life support services within a 15-minute drive of the International

3

Campus ("IC") at the Mogadishu International Airport ("MIA") compound. At the time the Somalia RFP was issued, employees serving the existing DOS contract were housed at the IC location and the secured residential compound and life support services were provided by Bancroft Global Development ("Bancroft"), a subcontractor of SOC, LLC ("SOC"), the prime contractor for the existing Somalia task order.

14.     In preparing to compete for the Somalia Task Order, JGO initially contacted Bancroft and requested a price estimate for the residential compound and life support services that would continue as a requirement under the new Somalia Task Order. Bancroft provided an inflated price estimate that JGO could not seriously consider including in a competitive bid.

15.     Having been essentially rebuffed by Bancroft, on April 25, 2019, JGO's Project Manager for the Somalia Task Order Randy Leonard ("Leonard") emailed RSLS to request a quote for the secure residential compound and associated life support services called for in the Somalia RFP. Leonard's email included a list of requirements, including the necessity of lodging within a 15-minute drive from the IC at the MIA compound.

16.     Drawing on its extensive in-region contacts and resources earned over the course of ten years, RSLS was able to promptly provide JGO with a detailed proposal and competitive pricing to provide the required services.

17.     On April 27, 2019, Randy Leonard sent an email to RSLS stating, "We are happy with the RSLS proposal for labor camp services and therefore intend to subcontract with RSLS for the provision of life-support services on the Somalia WPS II Task Order."

4

18.     On or around April 27, 2019, RSLS informed JGO that housing would be located at the SKA Home Lodge (the "SKA Compound"), a facility owned by SKA Somalia ("SKA")[1] and located inside the MIA compound within a 10-minute drive of the IC. RSLS advised JGO to exercise discretion with respect to SKA because it was a relatively young, strategic relationship that RSLS was cultivating with the aim of developing a valuable, long-term partner in Somalia.

19.     RSLS's admonition to JGO regarding SKA is typical of the precautions taken by RSLS to protect the significant investments made in forging key relationships in high-risk areas of the developing world—relationships that ultimately provide substantial benefit to contractors like JGO in competing for U.S. government task orders.

20.     On April 29, 2020, Leonard emailed RSLS to express JGO's appreciation: "Thank you very much for your response and fair pricing for the camp. I wanted to ensure you know that we are submitting the pricing and costs for RSLS to provide the labor camp."

21.     In addition, RSLS leveraged its in-country assets and invested time and resources to enable JGO to develop a compelling comprehensive proposal, which highlighted RSLS's ability to offer exceptionally competitive pricing for the mission and life support services required under Somalia Task Order.

22.     On May 10, 2019, JGO submitted its Somalia Task Order proposal to DOS ("Task Order Proposal"); DOS also received a competing, significantly higher priced bid from SOC.

23.     JGO's Task Order Proposal touted its relationship with RSLS and emphasized the substantial costs savings provided by subcontracting with RSLS.

---

[1] SKA Somalia is a subsidiary of SKA International Group, a well-regarded supplier of fuel, aviation and logistics services operating throughout the Middle East and Africa.

5

24.     JGO's Task Order Proposal clearly identified the SKA Compound as the proposed residential compound, highlighting that the facility was located within a 10-minute drive from the IC—well under the 15-minute requirement for the Somalia Task Order.  SKA was also included in the table of "Acronyms and Abbreviations" in JGO's Task Order Proposal.

25.     The price for JGO's Task Order Proposal was approximately $81.6 million, substantially less than the competing $112.3 million proposal submitted by SOC.[2]

26.     After considering JGO's and SOC's respective proposals, during or about September 2019, DOS awarded the Somalia Task Order to JGO.

27.     SOC's failure to win the Somalia Task Order meant that Bancroft would soon be supplanted by RSLS in providing the residential housing and life support services under the Somalia Task Order.  In October 2019, several weeks after JGO was initially awarded the contract, in a last-ditch effort to retain its position, Bancroft sent JGO a proposal for the residential and life support services that JGO had already committed to subcontract through RSLS.  In addition to being legally untenable, Bancroft's unsolicited proposal amounted to $6-7 million higher than RSLS's proposal.

28.     Meanwhile, SOC filed a bid protest, arguing that the SKA Compound did not satisfy the requirement that the residential compound be no more than 15 minutes away from the IC.

---

[2] The referenced amounts are provided in the GAO decision dated December 30, 2019, available here: https://www.gao.gov/assets/b-418027.pdf

29.     Specifically, SOC argued that JGO's claimed travel time failed to account for several checkpoints and a congested commercial gate, and SOC further speculated that JGO merely relied on the travel time calculated by Google Maps for traveling the route.

30.     JGO requested RSLS's help in countering SOC's bid protest, which RSLS provided at the expense of its own resources and by leveraging its in-country network, including performing time and motion studies and compiling critical, non-public information that was only locally accessible.

31.     RSLS's efforts enabled JGO to decisively rebut SOC's arguments, using Google Maps-based imagery showing the existence of two different routes between the points in question, the first of which required nine minutes of travel time and the second of which required 14 minutes and avoided the check points and commercial gate entirely.

32.     On December 30, 2019, the U.S. Government Accountability Office denied SOC's bid protest, citing the record provided by JGO as described, *supra*, in paragraph 29.

33.     At no time between its May 2019 submission of the Task Order Proposal and its successful defense of the award in December 2019 did JGO express anything other than firm conviction as to the suitability of the SKA Compound for the requirements of the Somalia Task Order, a position that JGO reinforced during the bid protest.

B.     THE MASTER SUBCONTRACT AGREEMENT

34.     Throughout September 2019, with the award status of the Somalia Task Order still pending, RSLS continued to provide price estimates, share local industry intelligence, and respond to numerous requests by JGO for assistance in developing proposals.

7

35.     After DOS's September 2019 award of the Somalia Task Order to JGO, on October 3, 2019, RSLS's owner and president Roy Shaposhnik ("Shaposhnik") met with members of JGO at Caliburn's headquarters in Reston, Virginia where he was introduced to Thomas Heasley ("Heasley"), a Caliburn Senior Vice President who was described as the executive in charge of JGO's performance of the Somalia Task Order.

36.     Prior to joining Caliburn in October 2018, Heasley had spent five years at SOC, the incumbent provider of the residential and support services at MIA and the company in charge of the subcontractor RSLS was poised to succeed upon commencement of the Somalia Task Order.

37.     In late September 2019, a Subcontracts Senior Administrator employed by Sallyport, Michael Phillips ("Phillips"), was introduced as the point person for negotiating and finalizing the documentation for RSLS's provision of residential compound and life support services required under the Somalia Task Order, namely a Master Subcontract Agreement ("MSA") between JGO and RSLS.  Prior to the introduction of Phillips, RSLS was unaware that Sallyport would also be involved in the coordination and administration of the engagement.

38.     In late October 2019, Shaposhnik and Adam Doolittle, RSLS's Chief Strategy Officer ("Doolittle"), had lunch at Morton's, a steak house in Reston, Virginia, with Leonard. During the lunch, Leonard revealed that Bancroft had recently submitted a proposal to remain the provider of residential and life support services described in the MSA, even though JGO had already committed the subcontract to RSLS. Leonard indicated that Bancroft's proposal was priced $6-7 million higher than RSLS's accepted quote.

39.     At JGO's request, in December 2019, RSLS prepared a proposal and price estimates for security personnel training that was required under the Somalia Task Order but was

8

not part of RSLS's original proposal; in January 2020 it was decided that the training component would be structured as a separate engagement from the MSA.

40.     On January 21, 2020, three weeks after the denial of SOC's bid protest, the MSA was fully executed.

41.     Article 1 of the MSA describes the documentation process for authorizing work, releasing funds, and coordinating performance of the particular elements of the engagement, as follows:

> Subcontractor's authorization to proceed with the provision of any services or goods shall be specifically provided for in a written Purchase Order signed by authorized representatives of the Parties. Each Purchase Order shall set forth, as applicable: (i) the Scope of Work (hereinafter "Work," "SOW," or "PWS") and any other project descriptions or information, including or referencing flow down clauses and special conditions, (ii) a schedule and due dates for deliverables, (iii) total compensation, (iv) designated JGO and Subcontractor authorized representatives for the Work, and (v) such other matters upon which the Parties may mutually agree.

> Subcontractor shall only be authorized to begin the Work after the Purchase Order Form(s) is fully executed by signature of an authorized representative of Subcontractor, an authorized representative of JGO, and the Purchase Order is returned to the Subcontractor.

42.     Article 1 of the MSA also includes language regarding RSLS's obligation to respond and take corrective action immediately when notified by JGO of a "contract/performance requirement issue":

> Subcontractor shall immediately respond to any request or notification made by JGO to take corrective action to correct any defect, material or otherwise; problem; alleged breach; schedule of the Work; or contract/performance requirement issue; and thereafter, take immediate steps to take corrective action. Failure by Subcontractor to immediately respond to a request to take corrective action and/or immediately take corrective action acceptable to JGO may result in Termination of this Agreement or any applicable Purchase Order subject to the provisions of this Agreement and or the relevant Purchase Order.

43.     Article 12 of the MSA sets forth the procedure and grounds for terminating for convenience a purchase order or the MSA itself, and provides in relevant part:

JGO shall have the right at any time to terminate this Agreement or a Purchase Order with or without cause (a "Termination"), upon written notice (e.g. "Termination," "Termination Notice," "Termination for Convenience," or "Termination for Cause"), [sic] A Termination may take place while a Suspension or Stop Work Order is in effect.

[***]

JGO agrees not to terminate for convenience unless 1) JGO's customer terminates for convenience, or 2) JGO must terminate Subcontractor in order to avoid a termination for default from JGO's customer in which case the Parties agree to discussions at Senior Management levels prior to JGO issuing Subcontractor a Termination for Convenience.

44.     In addition to the choice-of-law and venue provisions referenced in paragraph 11, *supra*, Article 17 of the MSA advises the parties to consider available informal dispute resolution procedures before resorting to litigation, and provides a broad range of examples but does not mandate a particular approach:

The Parties acknowledge that there are a number of informal dispute resolution procedures (such as arbitration, mediation, written negotiations, and informal conferences) which will be used in an effort to resolve any dispute arising out of this Agreement, or the alleged breach thereof.

The Parties agree that such informal mechanisms will be utilized prior to proceeding with a Legal Action but that in any event, any Legal Action must be at a venue in accordance with the above paragraph.

45.     Article 17 also includes permissive instructions for a party to request in writing that a particular informal dispute resolution procedure be utilized and provides a two-week timetable for the other party to respond to the proposed informal procedure or the substantive claim:

Should any such dispute arise, any Party may request in writing that a [sic] informal dispute resolution procedure should be utilized, stating in general terms the nature of the proposed and provide the other Party with sufficient descriptions and information regarding its position to permit informed assessments and decisions by the other Party.
The other Party shall then have a period of two (2) weeks in which to respond to the proposed procedure or to the claim itself. If no answer to such request is given within such period or the requested is rejected, then the requesting Party shall be free to pursue any Legal Action which may be available to that Party. If such request is accepted by the other Party or by both Parties in the situation where the proposed process is modified by negotiation, the procedure agreed to shall first be followed prior to either Party pursuing

10

Legal Action. In the event the Parties fail within two (2) weeks after the response to resolve the claim or controversy in the informal dispute resolution process agreed to, the requesting Party may, but is not required to, propose an additional informal dispute resolution procedure and if agreed to, the Parties shall proceed in like manner as above. Otherwise, the requesting Party may pursue a Legal Action.

Under no circumstances is a party required to wait more than two weeks to receive a response to a proposed informal procedure or to conclude that a mutually entered resolution effort is fruitless before pursuing a legal action.

46.     In the event of a dispute arising with respect to the MSA, Article 27 of the MSA provides for recovery of attorney's fees and costs by the prevailing party, as follows:

In the event that a dispute arises with respect to this Agreement, the Party prevailing in such dispute shall be entitled to recover all expenses, including, without limitation, reasonable attorney's fees and expenses, incurred in ascertaining such Party's rights or in preparing to enforce, or in enforcing, such Party's rights under this Agreement, whether or not it was necessary for such Party to institute suit.

## C.     HEASLEY/CALIBURN THWARTS PERFORMANCE OF THE MSA, AND JGO WRONGFULLY ATTEMPTS TO TERMINATE PURCHASE ORDER NO. 1 FOR CONVENIENCE

47.     Around mid-January 2020, RSLS learned that Heasley was planning to travel to Somalia.  On January 16, 2020, Shaposhnik emailed Heasley to request a phone call in order to coordinate schedules and connect in person during Heasley's time in Somalia. Heasley replied that he would be in touch with Shaposhnik as soon as he had an itinerary to share.

48.     Contrary to his January 16 email, Heasley never provided Shaposhnik with his itinerary or any further communication regarding his visit to Somalia.  Instead, Heasley proceeded to arrange a meeting with the owner of SKA in Dubai followed by a visit to the SKA Compound in Somalia without ever notifying Shaposhnik or making any effort to coordinate with RSLS.

49.     Heasley and another individual from Caliburn met with Michael Douglas, SKA's owner, and inquired as to the specific details of SKA's arrangement with RSLS and whether the

11

deal between the two companies was firm. Douglas responded that SKA was committed to RSLS and the deal with RSLS was firm.

50.     On January 19, 2020, JGO's Leonard informed RSLS of a change to the number of rooms provided in the Statement of Work ("SOW") portion of the MSA, from 28 rooms (10 single occupancy and 18 double occupancy) to 44 single occupancy rooms each having a private bathroom.

51.     On January 23, 2020, only two days after the MSA was executed, Heasley emailed Leonard regarding his having met with SKA Country Director, James Sheehan, and expressing a negative assessment of the SKA Compound in its then-unrefurbished condition.

52.     Concurrently, in a January 23 email to Shaposhnik, JGO asked RSLS to sign and return attached Purchase Order No. Somalia 001 ("PO1") which released approximately $258,000 in funding for the mobilization of RSLS to begin construction on the SKA Compound on February 4, 2020.

53.     The following day, January 24, JGO again emailed Shaposhnik, repeating its request that RSLS sign and return PO1.

54.     Alarmed at the mixed signals and conspicuous uncertainty introduced by Heasley regarding the SKA Compound, Shaposhnik informed JGO that executing PO1 was now fraught with enormous financial risks for RSLS given the indications that Heasley/Caliburn were now opposed to JGO's performance of the newly-signed MSA:

> [I]'m happy to execute it but we really need to have the language we discussed to provide us with some protection **contingent** of course of the clients funding. As soon as we launch we have to front close to 2 million USD and given the events of the last few weeks we are weary to commit ourselves to funding operations and have changes in place. Are we meant to receive the full year's PO on the 4th of February?

(emphasis in original).

12

55.     In late January, Heasley indicated to Leonard that JGO would be cancelling the MSA with RSLS and would instead be subcontracting with Bancroft to provide the secured housing at the IC. The explanation given to Leonard and subsequently represented to RSLS was that the Regional Security Officer, Overseas Protective Operations, and the U.S. Ambassador to Somalia were threatening to cancel the Somalia Task Order unless the housing solution was changed from the SKA Compound to the IC, purportedly for reasons related to travel delays caused by lockdowns and checkpoints occurring 2–3 times a year, notwithstanding the issue of travel delays and checkpoints having been fully resolved only weeks prior in the denial of SOC's bid protest.

56.     It can be reasonably inferred from Heasley's stated intention in January to terminate the MSA and sign an agreement with Bancroft that substantive discussions/negotiations between Bancroft and Heasley/Caliburn had likely begun shortly after the denial of SOC's protest, despite JGO having prevailed by resolutely arguing that RSLS's solution fully met the DOS's housing requirements at a far superior price to that offered by SOC using Bancroft. Heasley/Caliburn appear to have almost immediately started laying the groundwork to replace RSLS with the far more expensive Bancroft, *while simultaneously overseeing and supporting JGO's efforts to finalize the MSA with RSLS, which JGO executed on January 21.*

57.     On February 2, 2020, Heasley sent Shaposhnik an email comprised of ambiguous and cliched allusions to "shifting fluidity," "known unknowns," and "adjustments [that] may not be well received," followed by boiler-plate assurances and a proposal for a phone call:

> Randy shared with me that he's been in touch with you about my recent visit to Mogadishu and the shifting fluidity of guard force housing there. In program management there is always a factor of known unknowns. When confronted with any of these we must adjust accordingly. We understand these adjustments may not be well received by us or anyone

involved, though ultimately we must adjust. However, please know that we at Caliburn value our relationship with you and look forward to many successful endeavors in various locations for years to come under multiple DoD and DoS IDIQs. To further discuss this, I would like to set up a call (or meeting) that includes Joe Bopp, CD Moore our COO, along with myself to speak with you and your team. At your convenience. V/R Tom

58.     Heasley's email is typical of the non-substantive, doublespeak that would follow from Caliburn over the course of February through May and throughout the remainder of 2020.

59.     In his reply, Shaposhnik reminded Heasley that RSLS had actively supported JGO on multiple other tenders for task orders, including several in which RSLS supported JGO even though RSLS did not join the task order, and asked Heasley to propose a time for a phone call.

60.     However, Heasley did not follow through on his purported desire to set up a call or meeting with the members of Caliburn's senior management—Joe Bopp, Caliburn's Sr. Vice President of Business Development ("Bopp"), and C.D. Moore, Caliburn's Chief Operating Officer ("Moore")—whom Heasley had referenced in his February 2 email.

61.     Despite being fully aware that the call/meeting between JGO or Caliburn senior management and RSLS, as described in Heasley's February 2 email, had not occurred, on the morning of February 4, JGO emailed a letter to RSLS titled "Termination for Convenience", which provided in relevant part:

> Pursuant to Article No. 12 of the referenced Master Subcontract Agreement (MSA), you are hereby notified Janus Global Operations (JGO) is terminating the referenced Purchase Order for convenience as of the date of this letter.

> Under the terms of the Subcontract, Article No. 12, your company is entitled to be compensated for Work performed through the date set forth in this Termination Notice plus reasonable costs actually incurred as a result of the Termination in accordance with Article 7 of the MSA, entitled "Changes and Additional Compensation." Understand that you will not be paid for anything beyond those termination costs specifically allowed under Article 12 of the MSA. With this in mind, you are requested to provide JGO with the amount of any termination costs within 2 weeks of the date of this termination notice.

14

Nowhere in its "Termination for Convenience" letter did JGO identify the specific provision of Article 12 pursuant to which JGO was permitted to terminate for convenience.

62.    RSLS promptly acknowledged receipt of JGO's "Termination for Convenience" letter and directly disputed the existence of grounds for termination for convenience under Article 12 of the MSA:

> We respectfully disagree that JGO can validly terminate our PO for convenience at this time. As your letter suggests, the relevant MSA clause is Article 12, which provides in part:
>
> > *JGO agrees not to terminate for convenience unless 1) JGO's customer terminates for convenience, or 2) JGO must terminate Subcontractor in order to avoid a termination for default from JGO's customer in which case the Parties agree to discussions at Senior Management levels prior to JGO issuing Subcontractor a Termination for Convenience.*
>
> We are not aware of any circumstances that would justify a termination under either subsections (1) or (2) of this clause. **JGO has provided no information indicating that the conditions justifying termination exist. Moreover, JGO has not initiated senior management discussions prior to issuing its termination notice.** Therefore, we believe that our purchase order remains in effect, and reserve all rights that we may have.
>
> Notwithstanding this position, RS Logistical Solutions wants to work with JGO to resolve this matter amicably. We are confident that whatever prompted your termination notice can be addressed by our two companies. It is clear that you do not want us to continue performance at this time, so we will construe your February 4 letter as a suspension of work notice. We appreciate the statement in your e-mail that Caliburn is committed to working with RSLS on this program, and look forward to having discussions at your earliest convenience so we can continue our joint performance of the Mogadishu contract.

(Emphasis added).

63.    On the evening of February 4, 2020, Sallyport's Procurement Director Ned Lowry ("Lowry") responded to RSLS with heavily qualified assertions regarding the circumstances that allegedly prompted JGO's attempt to terminate for convenience under Article 12:

> Our position relative to the termination memo is based on detailed discussions with our customer wherein we believe we are taking steps to avoid a termination from the customer. And, it was my understanding that there had been senior level discussions between you and Mr. Tom Heasley, our Sr. Vice President and Group Manager for Caliburn and the group that manages this contract.

15

However, we absolutely support your request to reclassify the contractual direction to a suspension and believe it makes sense in light of the fact that the conditions on the ground in Mogadishu are continually changing and because we're both committed to working together on this contract where we can. We also believe that further discussions are warranted as relates to the current contract and would like to set up a meeting between you (and others from RSLS who you'd like to involve) and Mr. Heasley and Mr. Mark Warnecki. Mr. Warnecki will be reaching out to coordinate this meeting. Kind regards, Ned Lowry

64.     Lowry's email provided no substantive information or objective facts in response to RSLS's objection to JGO's defective termination attempt. Instead, Lowry concedes that JGO is terminating for convenience because "*we believe* that we are taking steps" to avoid a termination by DOS—an utterly subjective, non-substantive contention—and "it is *my understanding* that there had been senior level discussions between you and Mr. Tom Heasley"—an absurd evasion given that the senior management level discussions with Caliburn's COO and Sr. Vice President that Heasley proposed two days early had not occurred.

65.     Further demonstrating the frivolousness of JGO's *ex post facto* justifications for terminating for convenience, Lowry promptly abandoned JGO's "position relative to the termination memo" and announced that "we absolutely support your request to reclassify the contractual direction to a suspension." . Further, Lowry's statements that JGO and Caliburn were "both committed to working together on this contract where we can" and "[w]e also believe that further discussions are warranted as relates to the current contract" indicate that Defendants recognized the disputed status of the MSA.

66.     The combination of Lowry's substance-free explanation, his attempt to redefine "senior management levels" downward from Heasley's February 2 reference to Caliburn's COO and Sr. VP, and his eager reclassification of termination for convenience of PO1 to a suspension

of PO1 demonstrate that, as of February 4, 2020—the commencement date for the MSA—JGO and Caliburn knew that the MSA could not be legally terminated for convenience.

**D.    CALIBURN'S ONGOING SABOTAGE OF RSLS'S CONTRACTUAL RIGHTS AND JGO'S REPUDIATION AND BREACH OF THE MSA**

67.    For the next three and a half months, from February 4 to May 16, 2020, Caliburn actively undermined, and JGO refused to perform, the MSA, while repeatedly expressing a variety of vague concerns, equivocations, and doubts regarding the SKA Compound's acceptability to DOS—this despite the SKA Compound having been directly challenged, thoroughly evaluated, and affirmed in the denial of SOC's protest bid in December 2019.

68.    In a February 7, 2020 text exchange, Shaposhnik asked Heasley if there was any news from DOS, to which Heasley replied "Status quo at DoS. Mogadishu. We have to look at housing alternatives" before changing the subject to a new Request For Proposal and offering to put RSLS in touch with a proposal team.

69.    Later that day Heasley made an email introduction between Shaposhnik and JGO program manager Michael Reynolds ("Reynolds"), as follows:

> Mike, I'd like to I introduce you to Roy Shaposhnik of RSLS. Roy may be a valuable asset to you in the procurement of logistical support in Mogadishu and other locations to which we may venture. Please contact each other at your convenience. Thanks! Tom

70.    Shaposhnik thanked Heasley for the introduction and the next day, February 8, with Heasley cc'd, Reynolds responded with a price request for the armored vehicles to be provided by RSLS and directly quoted the applicable provisions from Article 2 of MSA:

> Tom,
> Thanks for the introduction.
>
> Roy,
> I hope this email finds you doing. Currently, Randy and the transition team are in need of 2x B6 armored vehicle for transportation services.

17

*The Contractor shall provide safe transportation for guards and support personnel in Mogadishu between contractor provided housing facility and the place of performance, and from the Mogadishu International Airport terminal in accordance with Mogadishu Mission Transportation Security and Travel Policy*

2x Armored B6 –Vehicles

Monthly lease in Mogadishu, Somalia price should also include preventative maintenance of oil and filter change (as needed basis).
Lease period 12 months, renewable Thanks

71.    Shaposhnik promptly replied, with Heasley cc'd, asking Reynolds to clarify whether his request referred to the vehicle requirements in the MSA or to a separate task:

Good morning Michael, Thank you for the email.

Are these vehicles for the MIA or are they to be used outside of the fence? This will effect price dramatically.

Also if it's for the WPS mission please note it ah [sic] should be 1 SUV and 1 15 seater according to the SOW.

At your service Roy

72.    Reynolds responded the following day, February 9, again with Heasley cc'd, informing Shaposhnik that JGO was requesting two quotes—one independent of the MSA and one pursuant to the MSA:

Good morning Roy. I did follow-up with Randy and confirmed the usages of these vehicles will only be inside MIA.

**1ST Quote**
2x Armored B6 –Vehicles for usage inside MIA. This price quote should also include preventative maintenance of oil and filter change (as needed basis).

**2nd Separate Quote**
1x Armored B6 –Vehicle and 1x Armored Van for usage inside MIA. This price quote should also include preventative maintenance of oil and filter change (as needed basis).

73.    Against the backdrop of Heasley's repeated, ominous suggestions of the precarious status of the MSA, Reynold's requests for armored vehicle quotes pursuant to the MSA appear utterly farcical. That Heasley would stand by while his JGO subordinate pushed Shaposhnik to

18

invest more resources in performing the MSA that JGO and Caliburn refused to perform suggests a calculated, flagrant indifference to even a minimal standard of good faith or fair dealing in JGO's contractual obligations to RSLS.

74. On February 13, 2020, Caliburn's COO Moore emailed an associate of RSLS, George Close, and represented the following:

> Thanks for raising concerns regarding *the State Department's interest in changing the housing requirement* for the Somalia WPS project. Please know that we carefully considered the points you raised with full engagement with our legal and contracting leads. *We have taken no actions to change our proposed solution and will not until specifically directed by an authorized DOS contracting official*. We are being responsive to *our customer's interest in evaluating another housing solution*, and we will continue informing that decision process as we discussed last week. I'm expecting *the DOS to make a decision near term* and we will keep you and Roy informed as that plays out. In the meantime, Roy is welcome to engage our business unit lead, Tom Heasley, at his discretion to stay abreast of this DOS deliberation process. We understand that *a decision to change the housing solution would impact RSLS*, and *if that is the COA chosen by the DOS*, we will continue to look for other support and partner opportunities for RSLS as we value the company's reputation and capabilities.
>
> *I also understand that Roy has reached out to DOS/AQM to inquire about their intentions*. As I'm sure you appreciate, this communication is not useful nor appropriate. We will keep RSLS informed of DOS deliberations, decisions and contractual direction.
>
> Again, thank you for raising concerns about any *potential DOS-directed changes* to the Somalia WPS project. I've cc'd our GC (Bill King) and contracting lead (Mark Warnecki) as they have been involved in supporting all facets of this capture, protest resolution and execution/transition phase of the program. I add them to reinforce that *this has the highest level of attention on the Caliburn leadership team*. Feel free to call at anytime if you want to discuss further. C. D.

(Emphasis added).

75. Moore's February 13 email illustrates (a) Caliburn's nearly compulsive insistence that the potential change in housing was entirely organic to DOS and that Caliburn/JGO had only ever been a completely passive observer of DOS's evolving position on JGO's "proposed housing

19

solution" and (2) Caliburn's/JGO's utter refusal and/or inability to provide any substantive information or basic clarity as to the nature of DOS's purported concerns over the SKA Compound.

76.     Moore's February 13 email also made the false assertion that Shaposhnik had reached out directly to DOS/Office of Acquisition Management; Moore was informed of the falsity of his claim on February 16.  RSLS currently is unaware of the number of individuals to whom Caliburn and/or JGO communicated the aforementioned false assertions.

77.     Moore's February 13 email included the unequivocal assurance that the impact of "potential DOS-directed changes" on RSLS "has the highest level of attention on the Caliburn leadership team" including its General Counsel Bill King—thereby representing that Caliburn was fully aware of the MSA, JGO's recanting and reclassification of the "termination for convenience" of PO1, and the ramifications of any actions taken by Heasley/Caliburn/JGO to encourage DOS to change its housing requirements.

78.     The events of February 2020 brought into clear relief the Defendants' intention to maintain JGO's willful repudiation of the MSA despite having no grounds for termination, while continuing its cynical effort to shift responsibility to its allegedly indecisive DOS customer and pretend that the MSA remained viable.

79.     On Friday, February 21, RSLS provided Defendants with written notice that a full-fledged dispute had developed regarding JGO's nonperformance of the MSA and the mounting evidence that Defendants were now categorically opposed to subcontracting with RSLS for the services described in the MSA.  Further, the February 21 communication informed Defendants of specific adverse consequences that a prolonged dispute would inflict on RSLS and provided a concrete proposal for a prompt, informal resolution of the dispute.  Finally, RSLS requested a

20

response by Monday, March 9, giving the Defendants two full weeks plus two additional days to ensure the due date did not land on a weekend.

80. Despite RSLS's having provided a clear written description of the dispute, a proposed informal resolution, and the courtesy of an extended response window, Defendants did not respond to RSLS until March 10, well after the two weeks required by Article 17 of the MSA and outside the generous timeframe offered by RSLS. In any event, Defendants rejected the informal resolution proposed by RSLS.

81. Defendants' failure to respond to RSLS's February 21 written proposal within two weeks, their eventual rejection of RSLS's informal resolution proposal, and their refusal to suggest an alternative informal resolution process of any kind demonstrate Defendants' indifference to exercising any of the informal dispute resolution examples referenced in Article 17 of the MSA and constitute a waiver of any assertion that this Complaint is premature.

82. On April 7, 2020, Shaposhnik emailed Moore and stated: "At this time it is around two months into the transition period and we have not heard any updates as you have indicated are due from DoS."

83. On April 15, Moore responded to Shaposhnik's April 7 email as follows:

Unfortunately I do not have any information to share from the DOS about the Mogadishu project except that the customer is looking at a two month extension to the transition period. We continue to wait for decisions and formal direction from the responsible contracting official. We will keep you apprised of any customer-directed changes to the WPS Somalia support plans.

84. On April 24, 2020, Heasley represented to Shaposhnik that "DoS has extended our transition completion date from June 4th to August 4th. They have not directed any other formal changes to our transition plan at this time."

85. On April 30, 2020, Moore emailed the following to Shaposhnik:

21

Thank you for the response to my last email. We remain hopeful that the DOS will advise soon about their intentions for support operations on the Mogadishu WPS project. We will be ready to discuss the way ahead once we have the DOS decision and formal direction from the contracting official. In the meantime, we have revised our transition timeline to the align with the customer-directed FOC extension to early August.

86. Finally, on May 16, 2020, Heasley sent an email to Shaposhnik stating that "yesterday the Department of State modified our Mogadishu WPS contract directing a housing solution consistent with their stated desire vice [sic] our proposed solution." Heasley did not provide any supporting documentation to substantiate DOS's purported modification of the Somalia WPS II contract.

87. Several weeks later, in June 2020, Caliburn terminated Heasley's employment.

88. Despite several requests from Shaposhnik to Caliburn's CEO Jim Van Dusen and Caliburn's Vice President for Contracts, Mark Warnecki, at no time did Caliburn or JGO provide any documentation to substantiate Heasley's representations on May 16, or to substantiate the date of DOS's purported decision, the grounds for DOS's purported decision, or the existence of DOS's purported decision itself.

89. Shaposhnik later learned that JGO did, in fact, formally engage Bancroft as its subcontractor after Bancroft submitted a third bid which quoted a price approximately $100,000 less than RSLS's earlier and accepted bid. While the catalyst for Bancroft's late-developing ability to offer such precisely competitive pricing, after having submitted successive bids running $6-7 million higher, is currently undetermined, Defendants' repudiation and breach of the MSA with RSLS ultimately did not result in any significant cost savings to the U.S. government.

22

**E. JGO'S ONGOING BREACH OF THE MSA; RSLS'S OUT-OF-POCKET LOSSES, LOST PROFITS AND OTHER DAMAGES**

90.     To date, with Caliburn's permission and/or at Caliburn's insistence, JGO has refused to perform the MSA, has failed to terminate the MSA as required under Article 12 of the MSA, and remains in breach of the MSA.

91.     JGO's breach of Article 12 of the MSA abrogates any corresponding limits on recoverable damages, including lost profits, set forth in the MSA.

92.     As a result of JGO's breach of the MSA, RSLS has incurred out-of-pocket damages in excess of $253,000.

93.      As a result of JGO's breach of the MSA, RSLS has incurred substantial costs, including attorney's fees and related legal expenses, in ascertaining its rights under the MSA and preparing to enforce said rights.

94.     As a result of JGO's breach of the MSA, RSLS has incurred expectancy damages in the form of lost profits in excess of $5.3 million.

95.     As a result of JGO's breach of the MSA, RSLS has incurred damage to its reputation and good will among the security and logistics contracting community in Somalia and elsewhere.

<u>**COUNT I – BREACH OF CONTRACT**</u>
**Against JGO**

96.     Plaintiff re-alleges and incorporates all previous paragraphs herein.

97.     Article 1 of the MSA provided that "Subcontractor shall immediately respond to any request or notification made by JGO to take corrective action to correct any … contract/performance requirement issue[.]"

23

98.     JGO notified RSLS of a potential "contract/performance requirement issue" in regard to the SKA Compound and the secured housing requirement; however, JGO actively denied RSLS the opportunity to take corrective action as was RSLS's right under Article 1 of the MSA.

99.     Pursuant to Article 12 of the MSA, JGO was required to provide written notice of any "Termination for Convenience."

100.    Pursuant to Article 12 of the MSA, "JGO agree[d] not to terminate for convenience unless 1) JGO's customer terminates for convenience, or 2) JGO must terminate [RSLS] in order to avoid a termination for default from JGO's customer in which case the Parties agree to discussions at Senior Management levels prior to JGO issuing [RSLS] a Termination for Convenience."

101.    JGO failed to engage in Senior Management level discussions prior to issuing a purported termination for convenience of PO1 or the MSA.

102.    JGO's customer did not terminate for convenience.

103.    JGO was not required to terminate RSLS in order to avoid a termination for default from JGO's customer.

104.    JGO failed to provide written notice of termination of the MSA, whether such termination was for convenience or for cause.

105.    By its actions JGO has demonstrated that it considers the MSA to have been terminated, but has failed to follow the termination procedure required by the MSA.

106.    As a result of JGO's breach of contract, RSLS has been damaged in an amount to be determined at trial.

24

## COUNT II – BREACH OF IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING
### Against JGO

107.   Plaintiff re-alleges and incorporates all previous paragraphs herein.

108.   JGO was bound by the covenant of good faith and fair dealing in its performance of the MSA and was aware of its obligations under said covenant.

109.   JGO was obligated to give RSLS a reasonable opportunity to perform the MSA.

110.   RSLS's reasonable expectations included the right to revise its SOW.

111.   JGO was obligated provide notice of information material to the performance of the MSA.

112.   JGO took actions that frustrated the right of RSLS to receive the fruits of the MSA.

113.   JGO failed to act in good faith and deal fairly in its wrongful attempt to terminate the MSA for convenience where the circumstances did not permit a termination for convenience.

114.   As a result of JGO's breach of implied covenant of good faith and fair dealing, RSLS has suffered damages in an amount to be determined at trial.

## COUNT III – ANTICIPATORY REPUDIATION
### Against JGO

115.   Plaintiff re-alleges and incorporates all previous paragraphs herein.

116.   JGO's words and conduct amount to a total and unqualified refusal to perform the MSA.

117.   JGO intentionally took multiple actions in order to render RSLS unable to perform the MSA.

118.   As a result of JGO's actions, RSLS has suffered damages in an amount to be determined at trial.

25

## COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACT
### Against Caliburn

119.    Plaintiff re-alleges and incorporates all previous paragraphs herein.

120.    Caliburn was fully aware of the MSA and JGO'S obligations under the MSA, including the provisions of Article 12.

121.    Caliburn actively orchestrated the conditions to prevent JGO's performance of the MSA and wrongfully attempted to supply a pretext for JGO to terminate the MSA for convenience.

122.    Caliburn, with malice, actively and intentionally orchestrated and/or encouraged JGO's breach of the MSA, including Article 12's requirements for terminating the MSA.

123.    As a result of Caliburn's interference with the MSA, RSLS has suffered damages in an amount to be determined at trial.

## COUNT V – TORTIOUS INDUCEMENT OF BREACH OF CONTRACT
## UNDER TENNESEE CODE ANN. § 47-50-109
### Against Caliburn

124.    Plaintiff re-alleges and incorporates all previous paragraphs herein.

125.    Caliburn was fully aware of the MSA and JGO'S obligations under the MSA, including the provisions of Article 12.

126.    Caliburn, with malice, actively and intentionally orchestrated the conditions to induce JGO's breach of the MSA, including wrongfully attempting to supply a pretext to induce JGO to terminate the MSA for convenience.

127.    Caliburn actively and intentionally induced and orchestrated JGO's breach of the MSA, including Article 12's requirements for terminating the MSA.

128.    As a result of Caliburn's tortious inducement of JGO's breach of the MSA, RSLS has suffered damages in an amount to be determined at trial.

26

## COUNT VI – QUANTUM MERUIT
### Against JGO and Caliburn

129.    Plaintiff re-alleges and incorporates all previous paragraphs herein.

130.    Plaintiff expended considerable resources and provided valuable services to Defendants, and Defendants accepted to those services during the preparation of JGO's Task Order Proposal and the successful defense of SOC's bid protest.

131.    Plaintiff provided said services before execution of the MSA and with the reasonable expectation, based on representations by JGO, that Plaintiff's provision of said services would be compensated and offset through performance of the MSA .

132.    To allow JGO and Caliburn to retain the benefit of Plaintiff's services and expenditures without reasonable payment would be unjust.

## RELIEF REQUESTED

WHEREFORE, Plaintiff R.S. Logistical Solutions LTD demands judgment in its favor against Defendant Janus Global Operations, LLC on Counts I–III, against Defendant Caliburn International, LLC on Counts IV–V, and against both Defendants on Count VI of this Complaint for damages in an amount to be determined at trial, together with interest, attorneys' fees, costs of suit, and such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff R.S. Logistical Solutions LTD by and through its attorneys, hereby demands a trial by jury as to all issues so triable.

Dated:  May 11, 2021

27

Respectfully submitted,

Lawrence J. Laurenzi (TN Bar No. 9529)
*application for admission pending*
Sarah E. Stuart (TN Bar No. 35329)
*application for admission pending*
BURCH, PORTER & JOHNSON, PLLC
130 North Court Avenue
Memphis, TN 38103
P: 901-524-5000
llaurenzi@bpjlaw.com
sstuart@bpjlaw.com

*Local Counsel for Plaintiff*

Michael J. Sullivan (MA No. 487210)
*application for pro hac vice forthcoming*
Kimberly West (MA No. 635401)
*application for pro hac vice forthcoming*
Nathan P. Brennan (MN No. 0389954)
*application for pro hac vice forthcoming*
ASHCROFT SULLIVAN, LLC
200 State Street, 7th Floor
Boston, MA 02109
P: 617-573-9400
msullivan@ashcroftlawfirm.com
kwest@ashcroftlawfirm.com
nbrennan@ashcroftlawfirm.com

*Counsel for Plaintiff*

28