

# MASTER SUBCONTRACT AGREEMENT
### Master Subcontract No:  R.S. Logistical Solutions 01.19.2020
### Prime Contract:  SAQMMA16D0047 (19AQMM19F2285)

This Agreement is made and is effective this nineteenth day of January 2020, by and between **Janus Global Operations LLC** located at 2265 Old Highway 95, Lenoir City, Tennessee, 37771 (hereinafter referred to as "**JGO**"), and **R.S. Logistical Solutions**, **(RSLS)** located at 13 HaMelacha st, Lod, Israel 7152026 (hereinafter referred to as "**Subcontractor**").  For the purposes of this Agreement, **JGO** and **Subcontractor** may be collectively referred to as the "**Parties**" or individually referred to as a "**Party**."

The Parties agree as follows:

## 1.      SCOPE OF SERVICE AND AUTHORIZATION TO PROCEED

Subcontractor's authorization to proceed with the provision of any services or goods shall be specifically provided for in a written Purchase Order signed by authorized representatives of the Parties.  Each Purchase Order shall set forth, as applicable: (i) the Scope of Work (hereinafter "Work," "SOW," or "PWS") and any other project descriptions or information, including or referencing flow down clauses and special conditions, (ii) a schedule and due dates for deliverables, (iii) total compensation, (iv) designated JGO and Subcontractor authorized representatives for the Work, and (v) such other matters upon which the Parties may mutually agree.

Subcontractor shall only be authorized to begin the Work after the Purchase Order Form(s) is fully executed by signature of an authorized representative of Subcontractor, an authorized representative of JGO, and the Purchase Order is returned to the Subcontractor.

This Agreement shall apply to each Purchase Order with Subcontractor, except to the extent expressly modified by each said Purchase Order.  Any modifications to this Agreement by way of a Purchase Order shall apply to that Purchase Order only.

The subcontractor shall furnish everything necessary for the performance of the Work including but not limited to all labor, personnel, facilities, equipment, materials and any other services necessary for the performance of the Work as specified by the Purchase Order.

Subcontractor shall have obtained, or shall obtain, prior to commencement of the Work, at Subcontractor's expense, all permits, licenses, certificates, authorizations, releases, or approvals required to comply with all applicable statutes, ordinances, orders, rules and regulations of the country, regional, state, and local governments having jurisdiction over the Work to be performed under this Agreement.  Subcontractor shall supply copies of any or all of the foregoing to JGO upon request.

Initials: _____ RSLS _____ Janus

Form #13-004b
DC #42717                                                                  1

October 18, 201_
Revision:  0

**EXHIBIT**
**A**

Case 3:21-cv-00178-DCLC-HBG   Document 21-1   Filed 06/30/21   Page 1 of 26   PageID #: 71

The Subcontractor's acceptance and commencement of the Work under a Purchase Order constitutes the Subcontractor's acknowledgement that they have received all information necessary in order to perform the Work in accordance with the requirements of this Agreement and said Purchase Order unless the Purchase Order indicates what additional information will be forthcoming.

Subcontractor shall immediately respond to any request or notification made by JGO to take corrective action to correct any defect, material or otherwise; problem; alleged breach; schedule of the Work; or contract/performance requirement issue; and thereafter, take immediate steps to take corrective action.  Failure by Subcontractor to immediately respond to a request to take corrective action and/or immediately take corrective action acceptable to JGO may result in Termination of this Agreement or any applicable Purchase Order subject to the provisions of this Agreement and or the relevant Purchase Order.

## 2.      SCOPE OF WORK (SOW)

**Summary:  In** support of the Worldwide Protective Services (WPS) II Program U.S. Mission Somalia.

**<u>Labor Camp</u>:**     Subcontractor shall provide a secure housing compound complete with apartment units to fully accommodate Janus' anticipated staffing requirements over a five-year period in Mogadishu International Airport (MIA).  Subcontractor's compound is located within the MIA and is within 10 minutes from the International Campus (IC).  The housing will meet all requirements stipulated by WPS II standards.

Subcontractor's compound will provide housing that includes restrooms and hygiene areas, offices, dining accommodations, a gymnasium, common areas, storage rooms, and laundry areas.   All facilities are constructed in accordance with international building codes and upgrades are in process to meet US codes where possible.

Subcontractor will provide a safe and secure environment, ensuring that those who protect the mission of Department of State (DOS) are also protected while on the compound. Subcontractor will assign one 24/7 safety/security officer position to control access at the gate entrance.  The compound perimeter will be equipped with barriers, watchtowers, CCTV and a complement of security staff who perform patrols.  Subcontractor shall install an additional CCTV system to provide their own monitoring within the compound.  Subcontractor will integrate complete fire safety measures that include smoke detectors, a fire suppression system, and an annunciator system that are up to code.  Additionally, Subcontractor will utilize a Public Address (PA) system throughout our compound for internal broadcasts.

All complexes offer overhead protection.  Blast wall protection is currently in place on the perimeter of the compound and within the compound and a designated bunker area is maintained that can accommodate all personnel.  The bunker meets UN MOSS standards.

To further enforce fire safety the Subcontractor will perform a 100% inspection of all electrical systems and potential fire hazard areas on a quarterly basis.  Additionally, Subcontractor will

Initials: _____ RSLS _____ Janus

Form #13-004b
DC #42717                                                    2
October 18, 2018
Revision:  10
Case 3:21-cv-00178-DCLC-HBG   Document 21-1   Filed 06/30/21   Page 2 of 26   PageID #: 72

include a "go bag/safety kit" in every room that includes essential equipment items such as an emergency flashlight, one MRE, a bottle of water and a medical kit.

As part of the Subcontractor's commitment to quality life support services, Subcontractor has identified all utility requirements and will incorporate a maintenance schedule to provide a sustainably safe, efficient, and comfortable living accommodation and workspace for guests. The Subcontractor's program-dedicated Maintenance Technician will oversee the maintenance program.

The Subcontractor's maintenance program is comprised of three elements to best sustain operations: (1) preventative maintenance (PM) for critical components such as refrigeration, air conditioning, wastewater treatment pumps, communications, and internet; (2) keeping adequate spares on hand for immediate replacement of any common maintenance items; and (3) a trained, responsive, courteous maintenance staff who can repair most routine problems on the spot. The maintenance program is based on the Subcontractor's experience operating in Africa and takes into consideration uncertainties that arise in terms of power supply, parts unavailability, and mission challenges.

**Electricity:** The compound shall be supplied with electricity from Beco a private company that provides electricity in the MIA. The electricity is typically reliable, however as a redundancy Subcontractor will maintain a camp generator and half-force generator as independent backup systems. All electrical outlets will be the same make/model and are installed according to US code with a ground fault circuit interrupter.

**Water:** Subcontractor will provide a pressurized hot and cold-water system throughout the compound that is suitable for all life support, hygiene, sanitary, and safety purposes. All water will be tested on a daily basis by the Subcontractor's Maintenance Technician and complete reports presented to Subcontractor's APM to ensure health standards are maintained. Piping will be installed to provide water for the kitchen areas, restrooms, and laundry station. Metal piping will be used for the fire suppression system. As an added benefit to JGO, Subcontractor shall provide drinking water as required to all guests and rooms are kept stocked as part of the service.

**Waste Management**: Subcontractor will perform daily waste management activities, including waste removal from the compound to ensure health and welfare of the camp. Subcontractor will provide fly and rodent-tight single service containers for garbage. All trash receptacles will be emptied on a daily basis.

**Climate Control**: Subcontractor will provide quality HVAC systems for each room. HVAC exists throughout the compound for all common areas including the gymnasium and the dining facility. HVAC systems maintain temperatures of at least 70 degrees during cold weather and no more than 80 degrees during hot weather. Subcontractor's Maintenance Technician maintains a strict schedule of inspections and performs preventative maintenance to ensure systems continuously perform over the five-year contract period.

Initials: _RSLS_ _MSP_ Janus

**Lighting**: Subcontractor will install at least one ceiling light per habitable area.

**Hygiene/Sanitary Facilities**: Subcontractor will provide western-style, fully ventilated facilities to accommodate all personnel on the compound that are conveniently located within 200 feet of each sleeping room and avoid requiring any staff to access the facility by passing through sleeping areas. All rooms will be equipped with lighting. Floor drains are installed for all shower baths and shower rooms and all floors are impervious to moisture.

**Janitorial**: All public spaces are cleaned and maintained by the janitorial staff. This includes floor sweeping/dry mopping, trash pickup, dusting, window/glass cleaning, trash receptacle emptying in all common areas, and restrooms. Care is taken to avoid interruption of ongoing functions and to avoid causing any safety hazards through wet floors. Communal restrooms are particularly important to public health and are cleaned twice daily and a log kept of who provided the servicing.

<u>**Housing**</u>: Subcontractor will provide permanent housing units within their compound that is segregated from other users of the compound. Subcontractor will provide a total of 28 rooms, with 10 being single occupancy and 18 being double occupancy. A temporary single room rental is provided for a 2-week period, once per quarter. Each room offers at least 75 square feet of living space per occupant and 7-foot ceilings. All rooms are complete with beds, storage space, and wall lockers. All space restrictions as specified by DOS are strictly upheld. Each bed is equipped with a new mattress, pillow and sheets.

**Housekeeping Services**: Subcontractor will provide a trained housekeeping staff to clean all rooms five days per week unless otherwise requested in support of representational, VIP, or special events. Housekeeping services will be thorough, prompt, and unobtrusive. All areas of the compound and all rooms are thoroughly cleaned every service day. All floors are mopped, and carpets vacuumed. Bedding is changed and washed daily. Soap and shampoo are replenished when empty. All waste containers are emptied, and the trash is removed.

Rooms will be made up between 9am and 2pm every day the staff is working. Guests may post a 'Do Not Disturb' sign and our people return at a later time. Between 2pm and 4 pm, Subcontractor's housekeeping staff will provide turn down service in each room, refill ice buckets, and replenish bottled water. The housekeepers will leave a signed comment card every day, which a mechanism for the guest to note anything that needs specific attention.

**Offices**: Subcontractor will provide 2 dedicated office spaces for use by JGO. Office spaces are equipped with desks, chairs, and high-speed wireless internet.

**MWR Internet Café**: Subcontractor will support Morale, Welfare and Recreation activities by providing 1 dedicated internet café-style space. This space offers privacy and allows staff to use Skype or other forms of approved communications in a secured, comfortable setting.

**Internet**: Subcontractor will provide a complete wired and wireless internet system throughout the compound that allow for uninterrupted streaming and VOIP. As a redundancy measure, we include a GSM back-up system with MiFi units throughout compound. Fiber and VSAT is also available in MIA through Somcast.

Initials: _____ RSLS _____ Janus

**Satellite / Cable TV**:  Subcontractor will provide 65-inch TVs in all common areas on the compound with back-up internet connectivity.  Each individual room and office is equipped with a 40-inch TV.  Also provided is DSTV with a selection of channels to accommodate both English speaking personnel and personnel from East Africa.

**Laundry Service**:  Subcontractor will install a laundry station complete with multiple machines on their compound.  Laundry is picked up daily every morning Monday through Friday by 8am and returned clean, folded, pressed, and hung on hangers where appropriate by 4pm the same day.

**Gymnasium**:  Subcontractor will provide a dedicated gymnasium on their compound complete with aerobic and strength equipment of industrial grade.  Included are free weights, a cross-cable machine, Smiths Machine as well as 5 treadmills, 3 stationary bicycles, and 2 rowing machines.  The gymnasium is complete with a TV.

**Meals**:  Subcontractor will provide a full-service dining facility with menus that are prepared on week in advance, which includes breakfast, main courses, and packed meals are also readily available with requisite utensils included.  Meals for TCH's and special dietary requirement meals services are available.  Food services will be in compliance with food safety standards for preparedness, handling and served in accordance with USDA standards.

**Medical Response Capability**:  A medic will remain on-site and tend to minor medical issues for all personnel housed on the compound.

**Transportation**:  Subcontractor will provide to JGO to mobilize their staff from the proposed housing compound to the IC.  Over the five-year period the proposed vehicles are: Level 6 Armored SUV (2017 or newer); Level 6 Armored 15 Passenger Van (2017 or newer); Subcontractor provided Soft Skin SUV.  These vehicles are only assigned to be used within the MIA area.  All vehicles will be covered by a full insurance policy including third party insurance.

Subcontractor's compound will allow for parking of 12 vehicles in the designated area for Janus' personnel.

**Project Management**:  Subcontractor will assign a full time Program Manager (PM) who is the senior-most individual on the contract.  Subcontractor's PM is fully responsible and accountable for implementation of all work assigned through the contract, and the PM has the authority to make real-time decisions as necessary.  The PM's primary role is to ensure conditions are set and met for full mission accomplishment and 100 percent contract compliance with all terms and conditions.  The PM will specifically focus on all relationships and lines of communication external to the program that are necessary for mission execution and program implementation to include vendor management.

The Subcontractor's PM establishes the working relationship with the JGO staff and other stakeholders.  The Subcontractor will also assign a full-time Assistant Program Manager (APM)/Concierge.  The Subcontractor's managers meet weekly with our program staff to review projected events and scheduled activities for objective planning.

Initials: _____ RSLS _____ Janus

Form #13-004b
DC #42717                                            5
Case 3:21-cv-00178-DCLC-HBG   Document 21-1   Filed 06/30/21   Page 5 of 26   PageID #: 75

October 18, 2018
Revision:  10

**Guest Services/Concierge**: The Subcontractor will assign a concierge attendant to provide personalized customer service on their compound. Services for visa documentation and airport transfers are arranged by the concierge. Also included is personal shopping and mail delivery from DHL, which is implemented to avoid placing a reliance on using the BPO in order to prevent smuggling concerns.

All guest service requests will be logged and responded to within one hour. Any emergencies or issues that would require responses outside the scope of the contract are immediately communicated to the Subcontractor's PM, and then to JGO.

**Personnel Management**: All Subcontract personnel will undergo team training to reinforce the service levels expected of each individual. These personnel will be well groomed, in uniform, meeting all health/hygiene certifications, with all shots current. Full health certifications including screens for communicable diseases will be completed for all personnel before contract start and every six months thereafter. Subcontractor will use a local medical facility to conduct these medical tests/certifications.

Food services personnel will not be allowed to work if they exhibit any undressed wounds or scrapes. Subcontract employees will be issued new uniforms at contract start and all items will be replaced on a 12-month cycle.

**Procurement and Logistics**: Subcontractor will use a multi-tiered approach to acquire the necessary supplies and consumables associated with contract implementation. Local resources will be used where possible for basic commodities, and closely monitoring for price and quality. Subcontractor can assign a soft skin vehicle for pick-ups and deliveries as necessary. The bulk of the consumables will be procured through Engility's logistics warehouse on a weekly basis, which offers the greatest availability and selection of quality fruits, vegetables, meats, breads, and non-alcoholic beverages. These supplies are used for housekeeping, sanitation, mechanical repairs, maintenance, and food preparation. Subcontractor's Logistics Specialist will identify commodity usage rates and best suppliers to develop a detailed Consumables Replenishment List that ensures the compound always maintains a working inventory for all required consumable items.

**Mobilization**: The Subcontractor Transition Team will be led by a dedicated Transition Manager (TM), Mr. Roy Shaposhnik, who is also the Subcontractor's owner. The TM will arrive in country within fiver (5) days after subcontract award.

**Quality Control**: The Subcontractor will perform quality control (QC) activities to ensure that they consistently provide mission and life support services that enable JGO to successfully meet their mission requirements for DOS. The Subcontractor will monitor and adjust service levels and provide supplementary support as required to allow the JGO leadership and personnel the opportunity to achieve 100% success on the program.

The Subcontractor will perform QC activities in the form of inspections and surveys that compile key metrics for review and analysis. This process will enable the Subcontractor's PM and

Initials: _Roy S_ RSLS _MSP_ Janus

Case 3:21-cv-00178-DCLC-HBG    Document 21-1    Filed 06/30/21    Page 6 of 26    PageID #: 76

Account Manager to make adjustments and take corrective action if needed or to reward the team for their performance on the program and further incentivize Subcontractor's workforce.

## 3. TERM

This Agreement shall be in effect for a period commencing on 1the effective date of this Master Subcontract Agreement as set forth above and until it is terminated pursuant to the terms herein, specifically following the base and option year period of performances:

- Base Year: 4 February 2020 – 3 February 2021 (This period of performance includes the 120 day transition period (February 4, 2020 – June 4, 2020)
- OY1: 4 February 2021 – 3 February 2022
- OY2: 4 February 2022 – 3 February 2023
- OY3: 4 February 2023 – 3 February 2024
- OY4: 4 February 2024 – 3 February 2025
- Ext (Dash 8): February 04, 2025 thru August 03, 2026

## 4. SCHEDULE AND DELAYS

Time is of the essence with regard to this Agreement and any Work performed under any Purchase Order. After commencement of the Work under any Purchase Order, Subcontractor shall notify JGO immediately by telephone, and confirm in writing within five (5) business days, of any event or condition impairing its ability to meet the schedule applicable to the Work, together with the proposed revisions to the schedule. Delays caused by matters outside of Subcontractor's control shall be addressed in accordance with the section entitled "Changes and Additional Compensation," but it is incumbent upon the Subcontractor to assert at the time of the notification that the causes of any delays are outside their control and explain why such causes are not within their control.

## 5. COMPENSATION

As compensation for performance of any Work, JGO shall pay Subcontractor a sum not to exceed the Total Amount as set forth in the Purchase Order, subject to additions and deductions as provided for in this Agreement and/or the Purchase Order.

The Total Amount paid or to be paid to Subcontractor, as set forth on the Purchase Order, includes any and all of Subcontractor's costs to perform the Work, which includes but is not limited to, and for which the Subcontractor shall be liable for, all income taxes, payroll taxes, levies, custom, duties, importation/exportation costs and taxes, contributions, interest accrued, penalties imposed, and all taxes, assessments or other charges levied on the Subcontractor by any government agency, authority or union on, or because of the services performed hereunder or any labor, materials, supplies, equipment, services furnished for or used in the performance of the Work, material handling, surcharges, overhead costs, general and administrative costs, any and all benefits, fees, or profit; and Subcontractor shall defend, hold harmless and indemnify JGO and Client against nonpayment of any of the aforementioned items.

Initials: _____ RSLS _____ Janus

Certain countries and regions require that contractors withhold and remit taxes from payments to subcontractors. It is hereby acknowledged that JGO will withhold and remit to the appropriate authority, taxes or other assessments required to be withheld in accordance with the laws or regulations of the applicable taxing or assessment authority with jurisdiction over contract performance, unless Subcontractor provides an exemption from such withholding, and provided JGO explains and informs Subcontractor of such withholdings in advance.

**Compensation Amounts are outlined as follows:**

Subcontractor agrees provide a fixed cost for a total anticipated staff of 46 that accounts for all camp and life support services as well as vehicle transportation as described within the SOW. our proposal. Subcontractor's price remains constant for the base year and each of the four option years.

The total annual price, excluding mobilization costs, is **$2,421,364.17** for a total projected five-year cost of **$12,106,820.84**. Actual costs will be prorated based on the contract start date.

Subcontractor's mobilization cost as a CLIN reimbursement payment on a monthly basis over the base year period (including NTP beginning February 4, 2020) is $64,433.33 for a total cost of **$773,200.00**. This mobilization cost includes the costs associated with acquisition and delivery of all vehicles as well as other start-up costs. Mobilization costs have been spread load over the course of the base year only.

Subcontractor shall not be authorized to incur on behalf of the JGO any expenses except as expressly specified in this Section 5 without the prior consent of the JGO's authorized representative, which consent shall be evidenced in writing. No verbal, or email agreements are authorized no matter who from JGO provides such directions.

## 6. INVOICE AND PAYMENT CONDITIONS

Unless provided otherwise in an issued Purchase Order, Subcontractor shall invoice JGO monthly for the Work performed under this Agreement. Invoices shall be sent to the Accounts Payable Department at JGO's Corporate Office in the United States addressed in the following manner:

> Janus Global Operations LLC
> Attn: Accounts Payable
> 2265 Old Highway 95
> Lenoir City, Tennessee USA 37771
> Or, via email to: ap-janus@caliburnintl.com

Questions or inquiries with regard to invoices shall be directed to the Accounts Payable Department at the address above or via the following additional methods of contact:

> JGO Point of contact listed in section **32. NOTICES**

Initials: _RSLS_ _MSP_ Janus

Any invoice submitted to JGO must clearly show the following: 1) the Subcontractor's name, 2) MSA number, 3) Purchase Order number; 4) project name 5) when and where the services were provided, 6) a description of services provided, and 7) provide as attachment(s) such supporting documentation for each invoice as JGO may reasonably require. JGO shall have 15 days upon receipt of the invoice to review and accept the invoice. Once an invoice has been accepted by JGO, JGO shall pay Subcontractor for same within thirty (30) days. In the event that there is a disagreement about all or any portion of an invoice, JGO will notify Subcontractor within fifteen (15) days of receipt of the invoice, identifying the cause of disagreement, and Subcontractor shall submit a revised invoice as appropriate.

Should more than forty-five (45) days pass without payment of an invoice deemed proper and contractually acceptable, the Subcontractor can apply a penalty of 1% for the outstanding amount of the invoice in process for every 30 days of delay in payment. The penalty will be invoiced in addition to the invoiced amount.

Unless the Purchase Order shall direct otherwise, for any Work performed that is not Firm Fixed Price (FFP) such as Time and Material (T&M) or Cost Plus efforts, the Subcontractor shall notify JGO thirty (30) days prior to the point at which the Subcontractor is expected to reach seventy-five percent (75%) of the total amount of compensation set forth on a Purchase Order.

Subcontractor understands and agrees that invoices paid by JGO shall be subject to any retention provisions that may be set forth within the Purchase Order. JGO shall pay to Subcontractor the amount of any retainage owed to Subcontractor within thirty (30) days of the date Client pays JGO retainage on the Work.

Payment of any invoice by JGO shall not imply final inspection or approval of the Work nor shall it relieve Subcontractor of its obligation or any warranty under this Agreement or applicable Purchase Order. Payment of an invoice by JGO shall constitute partial payment for any goods in progress of being manufactured or constructed under the Agreement or Purchase Order. As a condition precedent to JGO making final payment under this Agreement, Subcontractor, upon request from JGO, shall sign a Release of Claims and/or furnish documentation satisfactory to JGO and Client, that certifies that no liens, claims or judgments of any kind, including, but not limited to, mechanics' liens or stop orders arising directly or indirectly out of any act or omission of Subcontractor or any of its subcontractors, have attached against the work or upon any property owned by JGO or Client. JGO is authorized to use whatever means it may deem appropriate to cause such claims to be removed or dismissed and the cost thereof, together with actual attorney's fees, shall be immediately due and payable to JGO by Subcontractor. However, final payment shall in no way relieve Subcontractor of liability for its obligations or any warranty hereunder or for faulty, defective or non-conforming work.

JGO may withhold any sums due Subcontractor for any work performed pursuant to this Agreement, any Purchase Order, or any other contract or subcontract between JGO and the Subcontractor, to offset sums incurred as a result of a breach by the Subcontractor or to satisfy any liability or claim JGO has against Subcontractor including claims arising under this Agreement, and any Purchase Order, and any Work performed hereunder.

Initials: _____ RSLS _____ Janus

## 7.    CHANGES AND ADDITIONAL COMPENSATION

JGO, by written direction, may make changes in the Work including, but not limited to, increasing or decreasing the Work or directing acceleration of the schedule. Upon receipt of such written direction, Subcontractor shall, within a reasonable time given the circumstances but in any event within 15 days of receipt of same and in good faith, submit its written proposal, including any increase or decrease in cost and/or the contract schedule. Unless otherwise directed by JGO, unit prices, costs, labor rates, overhead, profit, and fees shall be at the same rates quoted by Subcontractor when originally calculating their pricing of the Work to be performed under the Agreement or Purchase Order.

If JGO accepts Subcontractor's proposal, a written amendment to the Purchase Order via a Change Order shall be executed by both parties and provided by JGO back to the Subcontractor. Unless otherwise directed in writing, Subcontractor shall not commence the Work set forth in the Change Order prior to the subcontractor signing the Change Order and JGO providing the Change Order which it has signed back to the Subcontractor.

If JGO does not accept Subcontractor's proposal, JGO may 1) withdraw the written direction; or 2) negotiate with Subcontractor concerning their proposal; and/or 3) provide Subcontractor with JGO's written estimate of the reasonable cost and/or schedule adjustments appropriate to perform the Work contemplated by the written direction and then direct Subcontractor to perform the Work in accordance with a Directed Change Order. If Subcontractor accepts JGO's estimate, a written Change Order shall be executed in accordance with JGO's estimated cost and schedule adjustments.

If Subcontractor does not accept JGO's estimate, Subcontractor shall notify JGO in writing within seven (7) days business days that it is performing the requested Work under protest and JGO shall pay Subcontractor in accordance with JGO's estimates while Subcontractor performs the work described in the Change Order. The difference between Subcontractor's proposal and JGO's estimate shall be a "dispute" to be resolved in accordance with the Section entitled "Disputes and Choice of Law" herein.

## 8.    UNFORESEEN CONDITIONS

Subcontractor acknowledges that it has the responsibility for all Work to be performed to acquaint itself with all requirements and the nature of the Work, including the written Scope of Work, the conditions under which the Work will be performed, and the conditions of the location(s) at which the Work will be performed and by accepting any Purchase Order represents that this responsibility has been met. Subcontractor also has the responsibility to exercise due diligence to anticipate certain reasonable and expected changes in conditions and as such, Subcontractor understands and accepts the risk that conditions may differ from those known or should have been known to Subcontractor and that neither the Total Amount of the Purchase Order, nor the time for performance, shall be altered.

Initials: _____ RSLS    _____ Janus

Whenever an event occurs or condition arises which Subcontractor believes it could not have anticipated and Subcontractor considers it to constitute a basis for additional compensation or a change in schedule or requirements, Subcontractor shall so notify JGO immediately by telephone, if feasible, and confirm in writing. However, notification must, in any event, be within five (5) business days after the occurrence or discovery of the condition or when discovery should have reasonably been made. Subcontractor shall request JGO to issue a Change Order and shall provide adequate supporting information to substantiate Subcontractor's position. Subcontractor shall not proceed with respect to the event or condition forming the subject of the request until receipt of a Change Order, or orally and then confirmed via a Change Order. In any event, JGO's maximum liability to Subcontractor for any such events or conditions shall be the reasonable costs incurred by the Subcontractor and extension(s) of time which have been authorized via a Change Order by JGO.

Upon receipt of notice of a request for Change Order from Subcontractor, JGO shall take one of the following actions:

a. Initiate the process set forth in the section entitled "Changes and Additional Compensation," or give other instructions by telephone or in writing, as appropriate and consistent with that same section. Or,

b. Submit a Change Order request to the Client that would encompass Subcontractor's proposed change. If the Client approves the submitted Change Order request, then JGO shall initiate the process set forth in the section entitled "Changes and Additional Compensation," or give other instructions by telephone or in writing, as appropriate and consistent with that same section. If the Change Order request is not approved by the Client, Subcontractor shall continue and/or resume the Work in accordance with JGO's instructions and the situation shall not constitute a dispute subject to the "Disputes and Choice of Law" Section in the Agreement as long as JGO initiates the Change Order request or Claim within a reasonable time period and pursues same until final resolution. Until final resolution, Subcontractor agrees to provide any supporting information requested by JGO and otherwise assist in the pursuit of said claim. Any final decision of a U.S. Department Board of Contracts Appeals or the U.S. Court of Claims in the pursuit of said Change Order or Claim shall be binding and act as a final resolution of the Claim between JGO and Subcontractor, as well.

## 9. INSURANCE

Subcontractor agrees that it now carries and will maintain in force, at its sole cost, during the performance of this Agreement, and shall require its subcontractors also to maintain, the following minimum levels of insurance,

Workers' Compensation Insurance.

1. For Work by Subcontractor in the United States - statutory limits. Employer's Liability - $1,000,000 per occurrence.

2. Workers' Compensation for Work by Subcontractor outside the United States (**DBA Insurance**) -

Initials: RSLS Janus

Subcontractor must comply with the requirements of the FAR 52.228-3-Workers' Compensation Insurance (Defense Base Act or DBA) and FAR 52.228-4-the Workers' Compensation and War-Hazard Insurance Overseas clauses. Subcontractor may also be required to procure DBA Insurance through a specific Broker and Program designated by the U.S. Government. In the event that JGO is providing DBA Insurance for and/or on behalf of the Subcontractor, then said condition must be specifically set forth in any Purchase Order and the Purchase Order must set forth all information required by JGO, including but not limited to actual wages paid to Subcontractor personnel, in order to accurately assess and pay premium payments of applicable DBA Policy(s).

b. Comprehensive General Liability - $1,000,000 per occurrence/$1,000,000 aggregate. This coverage shall include comprehensive form, premises, operations, XCU (underground, explosion and collapse hazard), products/completed operations, broad form contractual liability, independent contractors, property damage and personal injury.

c. Automobile Liability – for owned, non-owned, or hired vehicles - $1,000,000 per occurrence and $1,000,000 aggregate. If Work requires hauling or transportation of solid or hazardous waste, this policy shall include a MCS-90 Endorsement, which form shall be reflected on the corresponding Certificate of Insurance. This insurance shall name Janus and Client as an additional insured and shall contain a waiver of subrogation of Janus and its Client.

d. For Sub-consultant Services: Professional Liability Insurance - $500,000.00 per occurrence covering claims, damages and liabilities arising out of, or resulting from, Subcontractor's negligent acts, errors and omissions.

e. All policies shall, in regard to the Work:
   1. Include JGO and its Client as Additional Insureds (under b above);
   2. Be the primary to any other insurance maintained by JGO or its Client;
   3. Contain a severability of interest or cross liability provision, as well as a waiver of subrogation; and
   4. Provide 30 days advance notice to JGO in the event of any non-renewal, cancellation, restriction, or modification of insurance.

f. Subcontractor shall provide JGO with certificates of such insurance or satisfactory evidence that the above requirements have been met prior to commencement of the Work.

g. The above requirements are conditions precedent to JGO's obligation to pay Subcontractor.

h. Any waivers from these requirements must be set forth in any Purchase Order.

## 10. INDEMNIFICATION

Subcontractor, which for the purposes of this section shall mean the Subcontractor and their employees, hires, consultants, subcontractors, vendors, suppliers, subsidiaries, and affiliates,

Initials: _____ RSLS _____ Janus

shall defend, indemnify and hold harmless JGO and its client and each of their agents, officers and employees, from any and all claims and damages, causes of action, costs, expenses, reasonable attorney's fees, losses or liability, in law or in equity, of every nature or character whatsoever ("Claims") arising from or related to performance of this Agreement or any Purchase Order arising from any act or omission by the Subcontractor including, but not limited to:

    a.    personal injury, death, or damage to property to the extent caused by any act or omission of Subcontractor;

    b.    any violation by Subcontractor of any applicable national, regional, state, or local law, order, rule or regulation, including violation or breach of this Agreement and/or any Purchase Order;

    c.    any patent or copyright infringement by Subcontractor;

    d.    any injury, illness, disease, death or other harm suffered or incurred by Subcontractor, resulting from their failure to comply with applicable health and safety procedures such as a Health and Safety Plan;

    e.    any injury, illness, disease, death or other harm suffered or incurred by any employee when utilizing machinery, vehicles, or equipment supplied by the Subcontractor for that purpose.

    f.    claims and liens for labor performed by Subcontractor or materials used or furnished by them to be used for the Work;

    g.    any obligation to JGO's Client resulting from Subcontractor's breach of an obligation hereunder; and

    h.    contamination of, or adverse effects on, the environment.

Janus, which for the purposes of this section shall mean Janus and their employees, hires, consultants, subcontractors, vendors, suppliers, subsidiaries, and affiliates, shall defend, indemnify and hold harmless Subcontractor and each of their agents, officers and employees, from any and all claims and damages, causes of action, costs, expenses, reasonable attorney's fees, losses or liability, in law or in equity, of every nature or character whatsoever ("Claims") related to performance of this Agreement or any Purchase Order arising from or any act or omission by Janus.

## 11.   ENVIRONMENT, SAFETY AND HEALTH (ESH)

General

    a)  For the purposes of this Subcontract, the ESH program encompasses safety of employees, protection of environment, and the protection of property.

    b)  Nothing contained in this Paragraph shall diminish, alter or otherwise affect the section of this Agreement entitled "Indemnification".

    c)  Subcontractor shall place the highest priority on health and safety. Subcontractor shall be responsible for its activities and that of its employees or agents with respect to health and safety. The presence of JGO or any other party shall not affect Subcontractor's responsibility with regard to health and safety for its operations.

Initials: _____ RSLS _____ Janus

Form #13-004b
DC #42717               13
October 18, 2018
Revision: 10
Case 3:21-cv-00178-DCLC-HBG   Document 21-1   Filed 06/30/21   Page 13 of 26   PageID #: 83

d) In performing work under this Subcontract, the Subcontractor shall perform work safely, in a manner that ensures adequate protection of the public, employees, property and the environment. The ESH program shall be operated as an integral and visible part of the organizational approach. The Subcontractor shall exercise due care commensurate with the associated hazards of the work. The Subcontractor shall, in the performance of work, ensure that:

   i. Employees possess the experience, knowledge, skills, and abilities that are necessary to conduct their responsibilities safely.
   ii. Resources are effectively allocated to perform work safely.
   iii. Hazard Assessments are performed routinely with each task that address mitigated risks, emergency and non-emergency situations.

e) Subcontractor may be required and should be prepared to perform the Work in compliance with a site-specific Health and Safety Plan tiered under the JGO Corporate Environmental, Safety and Health Program as may be required by JGO's Client prior to the commencement of field activities.

f) The existence of any health and safety requirement or to perform Work under a Health and Safety Plan does not relieve the Subcontractor of the responsibility to provide equipment and institute procedures affording a greater degree of protection than those specified under such a Health and Safety Plan, if such equipment, processes, and procedures are necessary for the Subcontractor to perform the Work in a safe manner and in compliance with applicable national, regional, state, and local regulations.

g) The Subcontractor shall submit its Health and Safety Plan to JGO for review and comment before work commences (when requested.) The Plan shall be updated routinely based on changing conditions and any other factors affecting ESH.

h) The Subcontractor shall comply with ESH requirements of all applicable laws and regulations, and applicable Government Policies. The Subcontractor shall cooperate with JGO, Federal and non-Federal agencies having jurisdiction over ESH matters under this Subcontract.

i) JGO may issue an order stopping work in whole or in part for reasons of human safety or environmental protection without prejudice to any other legal or contractual rights. In the event that JGO issues a stop work order, an order authorizing the resumption of the work may be issued at the discretion of JGO. The Subcontractor shall not be entitled to additional fee or damages by reason of, or in connection with, any work stoppage ordered in accordance with the warranted exercise of this paragraph.

j) More restrictive ESH requirements cited elsewhere in the prime contract or subcontract are not waived by this section.

Applicable for Work at United States designated Hazardous Waste Sites:

a) If the Subcontractor is working on a hazardous waste site, all of Subcontractor's employees shall complete a safety and health training course(s) which conforms to the requirements of 29 CFR Part 1910. The costs and expenses related to such course(s) shall be paid by Subcontractor. Proof of completion of such course by each Subcontractor employee working on a hazardous waste site shall be furnished to JGO prior to said employee entering the site for any purpose.

b) Subcontractor is responsible for providing all personal protective clothing and equipment necessary for its employees to perform the Work in a safe manner and in compliance with all applicable state and federal OSHA regulations.

Initials: ROY RSLS MSP Janus

c) Subcontractor is responsible for ensuring that their equipment is in good condition and is properly inspected and maintained.

d) If Subcontractor transports or arranges for transportation of any waste, it shall be properly packaged, coded, marked and labeled in accordance with applicable U.S. federal, state, or local law, or regulation, or requirement. Title to and risk of loss with respect to any such waste shall pass directly from the Client to Subcontractor at such time as the waste is loaded for transport at the Client's facility.

## 12. SUSPENSION AND TERMINATIONS

JGO shall have the absolute right at any time to immediately suspend all or any part of the Work by providing the Subcontractor with written advanced Notice that is consistent with any advance notice allowed by JGO's customer (e.g. Suspension," "Suspension Notice," or "Stop Work Order"), and Subcontractor promptly shall comply with the request. Subcontractor shall immediately comply with all directions given by JGO concerning the Suspension (such as protection of assets and the Work performed), consultations and any other matters required by JGO and shall resume the suspended Work promptly after being notified by JGO to do so. Subcontractor shall be compensated for Work performed prior to the Suspension.

The Subcontractor shall also be entitled to compensation for reasonable costs actually incurred as a result of the Suspension. Any requests for compensation shall be in accordance with the section entitled "Changes and Additional Compensation."

JGO shall have the right at any time to terminate this Agreement or a Purchase Order with or without cause (a "Termination"), upon written notice (e.g. "Termination," "Termination Notice," "Termination for Convenience," or "Termination for Cause"), A Termination may take place while a Suspension or Stop Work Order is in effect.

If Termination is without cause, Subcontractor shall be compensated for Work performed through the date set forth in the Termination Notice plus reasonable costs actually incurred by Subcontractor as a result of the termination, in accordance with the section entitled "Changes and Additional Compensation."

JGO agrees not to terminate for convenience unless 1) JGO's customer terminates for convenience, or 2) JGO must terminate Subcontractor in order to avoid a termination for default from JGO's customer in which case the Parties agree to discussions at Senior Management levels prior to JGO issuing Subcontractor a Termination for Convenience.

In the event that JGO terminates Subcontractor for cause ("Termination for Cause") and it is subsequently determined that cause did not exist for the Termination, the Termination shall be treated as a Termination for Convenience (without cause), and Subcontractor shall be compensated in accordance with the section entitled "Changes and Additional Compensation."

JGO's reason(s) for Termination for Cause shall include, without limitation:

a. failure by Subcontractor at any time to provide the necessary labor, materials, supplies, equipment, or supervision for the proper performance of the Work. Any cure notice periods granted to JGO by their Customer will be reasonably granted to Subcontractor;

Initials: _____ RSLS _____ Janus

Form #13-004b
DC #42717                                                    15
October 18, 2018
Revision: 10
Case 3:21-cv-00178-DCLC-HBG   Document 21-1   Filed 06/30/21   Page 15 of 26   PageID #: 85

b.      failure to correct any material defect and/or repeated failure to correct any other defect(s)which it is obligated to correct after being notified by JGO to correct;

c.      substantial failure to comply with any one or more of Subcontractor's material obligations under this Agreement or Purchase Order including the obligation to provide data, reports, information, or documents required to be provided and/or requested by JGO;

d.      failure to maintain health and safety during the performance of the Work;

e.      failure to make timely payment to subcontractors or suppliers;

f.      failure to maintain proper quality control procedures and required licensing and certification;

g.      insolvency of Subcontractor or the entering into Bankruptcy or Receiver ship proceedings; and

h.      any assignment, whether voluntary or involuntary, by Subcontractor of any compensation ensuring under this Agreement or any Purchase Order for the benefit of creditors.

i.      for breach of nondisclosure or misrepresentation of any relevant facts required to be disclosed concerning a conflict of interest or potential conflict of interest under this Agreement.

j.      If a Subcontractor fails to take corrective action acceptable to JGO within the time period set forth within the notification to take corrective action provided by JGO, JGO shall be entitled to immediately terminate for cause the Agreement and/or Purchase Order without providing any further notifications or periods of time to take any corrective action and shall.

Upon Termination for Cause, JGO has the right and as such may take possession of, in a manner appropriate under the circumstances including at the Subcontractor's facilities, all materials, supplies, equipment, real property, and facilities which are fully or partially purchased or paid for by the Client or JGO and/or that JGO or the Client has any ownership rights and/or title, and then complete the Work or employ any other person or persons to complete the Work.

If JGO terminates the Agreement and/or Purchase Order for cause, then  Subcontractor shall not be entitled to receive any further payment relative to this Agreement or Purchase Order until the Work shall be wholly completed, at which time, if the unpaid balance to be paid to Subcontractor pursuant to this Agreement exceeds the cost and expense of completing the Work, the difference shall be paid by JGO to Subcontractor, and if such cost and expense to complete the Work exceeds the unpaid balance, Subcontractor shall be liable for and shall pay said difference to JGO.

After receipt of any type of  Termination action by JGO, Subcontractor, except as otherwise required by JGO, shall deliver to JGO all data, drawings, specifications, reports, summaries, and such other information and materials as may have been prepared by Subcontractor or received from JGO in the performance of the Work, whether completed or in process.

Initials: _____ RSLS _____ Janus

## 13.    WARRANTIES AND PROFESSIONAL CARE

Except for professional services, Subcontractor warrants the Work, together with all materials and supplies furnished by it, to be of good quality and free from any and all defects, and that the Work will conform to the requirements of this Agreement and all Purchase Orders.  When providing professional services, Subcontractor shall comply with all reasonable professional standards of care applicable to that service, trade, or craft, in the conduct of the Work and shall be responsible for the professional quality, technical accuracy, and the coordination of all studies, designs, drawings, chemical analyses, drilling and other services furnished by it under this Agreement.  Subcontractor shall, without additional compensation, correct or revise any errors or deficiencies in the Work.

For any construction Work, within the first year following completion of said Work, Subcontractor agrees to repair or replace, at its expense, any and all workmanship or materials or other portions of the Work that do not conform to this warranty.

## 14.    CONFIDENTIALITY

During the performance of the Work, and for two (2) years after completion, each Party, unless otherwise agreed to in writing by the other Party, shall not release information regarding the Work or terms of this Agreement, Purchase Order, or modification of the same (including all exhibits and attachments hereto) to any person other than the disclosing Party's authorized representative solely for purposes of carrying out such Party's obligations under this Agreement, except (i) for information that is in the public domain through no fault of the disclosing Party, and (ii) to the extent such release is required by law.

## 15.    COMPLIANCE WITH LAWS: UNITED STATES AND OTHER LOCATIONS

Subcontractor, in its dealing with JGO and with any other lower-tier subcontractor, agrees to abide by all laws and regulations of the United States which relate to the provision of the goods and/or services, the Work, under this Order.  Some of those laws and regulations include but are not limited to, and as amended, "The Foreign Corrupt Practices Act" 15 U.S.C. 78dd-1 et seq.; "The Procurement Integrity Act" 41 U.S.C. 2102; "The False Claims Act" 31 U.S.C. 3729; "Truthful Cost or Pricing Data Act" 41 U.S.C. 35 et seq.; "The Anti-Bribery Act" 18 U.S.C. 201; "Anti-Kickbacks Act" 41 U.S.C. 702; "Prohibition on Restricting Trade" 41 U.S.C. 4704; and the Federal Acquisition Regulation ("FAR") and the DFAR and DOSAR which sets forth requirements that implements some of the laws already referenced.  Specifically prohibited actions under this Order include but are not limited to bribery; kick-backs; gratuities; personal relationships and other conflicts of interests with government and/or contracting officials which might provide Subcontractor a knowing advantage; providing fraudulent or defective cost and pricing data; or projecting the appearance of impropriety with regard to any of the foregoing. If Subcontractor or their personnel will be providing the Work under this Order outside the United States, Subcontractor agrees to abide by all laws of the host country.

The Subcontractor shall abide by all import and export control laws of any country, such as the United States of America's International Traffic in Arms Regulations ("ITAR") and/or the Export Administration Regulations ("EAR") as well as those of Customs and Border Protection ("CBP"),

Initials: _____ RSLS _____ Janus

where the Subcontractor is providing and/or obtaining goods and services. Such laws may prohibit and/or require specific prior authorization, such as export licenses, in regard to utilizing items, technology, or services in another country or the provision of such items, technology, or services to certain foreign nationals. It is the Subcontractor's duty to understand and comply with these laws.

Specifically, but not limited to the below subsections, the Subcontractor represents the following in order to ensure compliance with this section of the Agreement:

a. That the Subcontractor shall take no action which would cause JGO, JGO affiliate, or any JGO officer or employee to be in violation of any law in a Host Nation where JGO is or is contemplating the performance of services, or the United States.

b. That the Subcontractor shall provide information to JGO as a part of any selection and/or approval process which is complete and true.

c. That no owner, partner, officer, director or employee of Subcontractor has been, is, or is anticipated to become during the term of this agreement (i) an official or employee of any government (federal, regional or local) or any political subdivision, ministry, agency, or political party, (ii) an employee of an enterprise owned or controlled by a government, (iii) a candidate for political office or hold political office, or (iv) an officer or employee of a public international organization, such as the World Bank. If any such owner, partner, officer, director or employee of Subcontractor shall become a candidate for political office, Subcontractor shall provide JGO with written notice of such intent identifying the office sought, the date of the election and whether that person would remain employed by Subcontractor if elected.

d. That the Subcontractor shall not directly or indirectly pay, offer, promise or give or authorize to pay, offer or give money or anything of value to (i) any official or employee of any government (federal, regional or local) or any political subdivision, ministry, agency, or political party, (ii) any employee of an enterprise owned or controlled by a government, (iii) a political party, a candidate for political office or person holding political office, or (iv) an officer or employee of a public international organization, such as the World Bank, or to any other person while being aware of or having a belief that such money or item of value will be passed on to one of the above, to influence any act or decision by such person or by any governmental body for the purpose of obtaining, retaining or directing business to JGO or to otherwise obtain an improper advantage for JGO.

e. That any fee paid by JGO to Subcontractor hereunder shall be for services actually rendered to JGO, and no part of any such fee paid to Subcontractor hereunder or any other funds of Subcontractor shall, directly or indirectly, be paid to, or accrue for the benefit of, any official, agent, or employee of any government (federal, regional or local) or any political subdivision, ministry, agency, or authority thereof, an enterprise owned or controlled by a government, or a political party or an official, agent or employee of a political party, or a

Initials: _____ RSLS _____ Janus

Form #13-004b
DC #42717
18
October 18, 2018
Revision: 10

Case 3:21-cv-00178-DCLC-HBG   Document 21-1   Filed 06/30/21   Page 18 of 26   PageID #: 88

candidate for political office, or a director, officer, employee or shareholder of any customer or known prospective customer of JGO.

f. That the Subcontractor represents and certifies that it has not or any of its principals have been convicted of or pleaded guilty to a criminal offense, including one involving fraud, corruption, or moral turpitude, that it is not now, to the best of its knowledge, the subject of any government investigation which has not been disclosed to JGO, and that it is not now listed by any government agency as debarred, suspended, proposed for suspension or debarment, or otherwise ineligible for government programs.

g. That the Subcontractor agrees to give prompt written notice to JGO if, at any time during the term of the Agreement, Subcontractor has failed to comply with or has breached any of its warranties. In the event Subcontractor has breached any of its warranties, it shall forfeit any claim to future payments under this contract.

h. That with respect to Subcontractor's compliance with its obligations under this Agreement, at all times that this Agreement remains in effect and for a period of twenty-four months following any lapse or termination of this Agreement, JGO shall have the right to conduct an audit of Subcontractor's records that reasonably relate to such compliance. Such audit shall include the right to interview Subcontractor's employees, and representatives with respect to such records.

## 16. COMBATING TRAFFICKING IN PERSONS:

The United States Government and JGO have adopted a zero-tolerance approach to the effort to end human trafficking.

Subcontractor agrees to comply with all laws and regulations of the United States, as amended, which relate to the effort of "Combating Trafficking in Persons." This would include but is not limited to 18 U.S.C. 1581 (Peonage, Slavery & Trafficking in Persons) and FAR 52.222-50 "Combating Trafficking in Persons." Some of the practices prohibited by these laws during the period of performance include: severe forms of trafficking in persons, procuring commercial sex acts, indentured servitude, recruiting fees, illegal withholding from pay, inhumane living conditions, misleading employment agreement and/or not in the employee's native language, and the withholding of an employee passport or other traveling documentation for the purpose of restricting travel. Under certain situations where the value of an Order is at a certain threshold (e.g. $500,000), Subcontractor may be required to implement a Program to address human rights and involving risk/impact assessments, training, certification, and posting information. JGO will advise Subcontractor under these circumstances.

The following information and definitions have been provided to JGO by the United States Government in order that it may be inserted in this Agreement.

The Contractor and/or Subcontractor shall not:

(1) Engage in severe forms of trafficking in persons during the period of performance of the contract

Initials: _Roy S_ RSLS   _MSP_ Janus

(2) Procure commercial sex acts during the period of performance of the contract; or

(3) Use forced labor in the performance of the contract.

*Severe forms of trafficking* in persons means –

(1) Sex trafficking in which a commercial sex act is induced by force, fraud or coercion, or in which the person induced to perform such act has not attained 18 years of age; or

(2) The recruitment, harboring, transportation, provision or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage or slavery.

*Commercial sex act* means any sex act on account of which anything of value is given to or received by any person.

*Forced Labor* means knowingly providing or obtaining the labor services of a person –

(1) By threats of serious harm to, or physical restraint against, that person or another person;

(2) By means of any scheme, plan or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or

(3) By means of the abuse or threatened abuse of law or the legal process.

Engaging in any act prohibited by this "Human Trafficking" subsection shall subject Employee (Contractor and/or Subcontractor) to immediate disciplinary action up to and including termination.

It is the Subcontractor's obligation to understand and seek their own counsel in regards to the above laws and regulations as well as the best method to implement, provide oversight, gather best practices and lessons learned, and then achieve continuous improvement.

The Subcontractor shall include the above language in all consulting agreements and subcontracts of any tier that are utilized during the performance of the Work. The terms "contract", "Contractor", and "Contracting Officer" which are referred to within any of the above referenced laws or regulations shall be interpreted so as to mean "Agreement," "Subcontractor" and "JGO" respectively. Any other language in the above references laws shall be likewise interpreted appropriately in order to preserve JGO's rights.

## 17. DISPUTES AND CHOICE OF LAW

The validity, performance and enforcement of any disputes related to this Agreement shall be governed by the laws of the State of Tennessee. The Parties agree that the proper venue for any lawsuit, claim, dispute or other type of legal or judicial actions ("Legal Action") arising hereunder shall be the state and federal courts located in either Knox or Loudon County, Tennessee and the Parties specifically consent to personal jurisdiction therein. The English language version of this Agreement will be the controlling and official version of this Agreement.

Initials: _____ RSLS *MSP* Janus

The Parties acknowledge that there are a number of informal dispute resolution procedures (such as arbitration, mediation, written negotiations, and informal conferences) which will be used in an effort to resolve any dispute arising out of this Agreement, or the alleged breach thereof. The Parties agree that such informal mechanisms will be utilized prior to proceeding with a Legal Action but that in any event, any Legal Action must be at a venue in accordance with the above paragraph. Should any such dispute arise, any Party may request in writing that a informal dispute resolution procedure should be utilized, stating in general terms the nature of the proposed procedure and provide the other Party with sufficient descriptions and information regarding its position to permit informed assessments and decisions by the other Party. The other Party shall then have a period of two (2) weeks in which to respond to the proposed procedure or to the claim itself. If no answer to such request is given within such period or the requested is rejected, then the requesting Party shall be free to pursue any Legal Action which may be available to that Party. If such request is accepted by the other Party or by both Parties in the situation where the proposed process is modified by negotiation, the procedure agreed to shall first be followed prior to either Party pursuing Legal Action. In the event the Parties fail within two (2) weeks after the response to resolve the claim or controversy in the informal dispute resolution process agreed to, the requesting Party may, but is not required to, propose an additional informal dispute resolution procedure and if agreed to, the Parties shall proceed in like manner as above. Otherwise, the requesting Party may pursue a Legal Action.

Subcontractor acknowledges that JGO's Prime Contract may include a disputes resolution clause which may limit JGO to certain dispute resolution procedures with regard to disputes or Legal Actions with its Client, such as arbitration or administrative proceedings. In the event that such procedures govern such disputes, JGO will make this fact known to the Subcontractor during the process outlined in this section. In turn, when a dispute between JGO and Client affects Subcontractor, Subcontractor agrees to participate as a party in, and be bound by the dispute resolution procedures in the Prime Contract.

## 18. SUBCONTRACTS AND ASSIGNMENTS

Subcontractor must identify any potential subcontractors in its proposals. Otherwise, Subcontractor shall not subcontract any portion of the Work without the prior written approval of JGO. Each subcontract of the Subcontractor must contain provisions, or be made expressly subject to provisions at least as restrictive in form and content as those contained or referenced in this Agreement and applicable Purchase Order. Subcontractor shall advise each prospective subcontractor of these requirements and shall ensure each subcontractor's compliance with all requirements therewith.

Subcontractor shall not assign, transfer, or sublet any portion of the Work required by this Agreement or applicable Purchase Order, nor assign any payment hereunder to anyone, without the written consent of JGO.

## 19. INDEPENDENT CONTRACTOR

Subcontractor shall operate as, and have the status of, an independent contractor and shall not act as or be an agent or employee of JGO or JGO's Client. Subcontractor shall be solely

Initials: RSLS _MSP_ Janus

responsible for determining the means and methods for performing the Work. Subcontractor's personnel shall be subject to the review and approval of JGO and shall be competent, qualified and cooperative. JGO shall have the option, at its sole discretion, to require Subcontractor to replace personnel at Subcontractor's expense.

## 20.    OWNERSHIP OF DOCUMENTS, PATENTS AND COPYRIGHTS

Unless otherwise specified in the Purchase Order, the Work and all records relating to it developed for JGO or JGO's Client in the performance of the Agreement, including, without limitation, all drawings, specifications, reports, summaries, samples, photographs, notes, calculations and other documents shall be deemed the property of JGO or JGO's Client. Subcontractor shall maintain all such materials in kind or electronically, except for samples, for a period of not less than three (3) years after completion of the Work.

If Subcontractor or its personnel produce any inventions or prepare copyrightable material as a result of the performance of Work, Subcontractor retains ownership thereof, but agrees to (1) promptly disclose such inventions or materials to JGO, and (2) with regard to same, grant to JGO and JGO's Client an irrevocable, nonexclusive, royalty-free worldwide license, and the irrevocable right to grant nonexclusive, royalty-free licenses to their affiliates without accounting to Subcontractor, to use same.

## 21.    CONTACT WITH JANUS' CLIENT

In certain situations the Subcontractor may, and only if required in performance of the written Scope of Work, have dealings with JGO's Client. Otherwise, the Subcontractor is prohibited from contacting JGO's Client for matters dealing with either the Scope of Work or Compensation. If JGO's Client initiates contact with Subcontractor or requests information or services from Subcontractor not in accordance with the Work, Subcontractor shall immediately report said contact and requests to JGO.

## 22.    INSPECTION

AS may be applicable under certain Scopes of Work, Subcontractor shall permit the representatives of JGO's Client and JGO to inspect and/or observe the Work at all reasonable times, and all Work shall be subject to acceptance and approval by JGO and JGO's Client. Under certain Scopes of Work, JGO may order such tests and inspections as required. If the Work tested or inspected does not meet the requirements of this Agreement, Subcontractor shall pay for such tests or inspections including the cost of repairing and replacing the materials or areas tested or inspected.

## 23.    HIRING OF JANUS EMPLOYEES

Subcontractor agrees that during the term of this Agreement, and any Purchase Orders still in performance, and for a period of one (1) year thereafter that they will not hire either directly or indirectly any employee of JGO. This clause applies to any subsidiary, affiliate, or other entity owned or controlled by the Subcontractor. Further, the term "hire" as used in this paragraph

Initials: _____ RSLS _____ Janus

includes any terms of financial, material, or like remuneration, monetary or otherwise offered to the JGO employee.

## 24. USE OF JANUS' OR OTHER EQUIPMENT PROVIDED

In the event Subcontractor shall use Janus' equipment, materials, labor, supplies or facilities, Subcontractor shall reimburse JGO at an agreed upon predetermined rate. Further, Subcontractor assumes all responsibility for physical damage to such equipment, materials, labor, supplies or facilities used by Subcontractor or his agents or employees. Subcontractor accepts any and all of JGO's equipment, materials, labor, supplies or facilities as furnished.

In the event the Subcontractor is provided equipment, materials, or other property which is owned or will be owned by the Client (e.g. GFE of CAP), then the Subcontractor shall use the required care to safe-guard such items, assumes all responsibility for the physical damage or loss of such items as well as accepting such items as furnished.

## 25. AUDIT

Authorized representatives of JGO and JGO's Client shall have access, at all reasonable times, to Subcontractor's personnel job descriptions, books, records, correspondence, plans, receipts, vouchers and data stored in computers pertaining to the Work, for purposes of auditing and verifying the accuracy of costs and hours relating to the Work for which JGO is to credit Subcontractor hereunder or for any other reasonable purpose. Subcontractor shall preserve and provide audit access to all information referred to above for a period of not less than three (3) years after completion and acceptance of the Work or termination of the Agreement.

If Subcontractor's charges, or any part of them, are calculated on fixed rates or unit prices or is a specified sum, JGO or Client's representatives shall be provided with sufficient documentation to verify and validate such charges.

## 26. NOTIFICATION OF CONFLICT OF INTEREST

Subcontractor and its lower-tier subcontractors warrant that no conflict of interest exists between Subcontractor, any related party, client, customer, or third party, including any organizational conflict of interest (OCI), between the Services and Products to be provided under this Agreement and Subcontractor's other activities in accordance with FAR 9.505. Subcontractor shall immediately advise JGO of any such conflict of interest , potential conflict of interest, or the appearance of a conflict of interest which arises during performance of any Purchase Order or subsequent Change Order. The subcontractor shall avoid situations wherein their actions may present a conflict of interest between their obligations to JGO under this Agreement and any other business arrangement they may have. The subcontractor warrants that there are no relevant facts or circumstances which could give rise to an organizational conflict of interest. This includes disclosing to JGO of any personal affiliation that they or any of their employees may have or had with either current or previous JGO personnel. The subcontractor shall disclose all such relevant information in writing prior to delivery of items and/or services. Furthermore, subcontractor shall have an ongoing duty to immediately disclose any new facts or changes of circumstance that may occur during the course of this agreement.

Initials: _RSLS_ _MSP_ Janus

Form #13-004b
DC #42717                                              23
October 18, 2018
Revision: 10
Case 3:21-cv-00178-DCLC-HBG   Document 21-1   Filed 06/30/21   Page 23 of 26   PageID #: 93

Disclosure of personal affiliation or similar information will not necessarily disqualify or otherwise negatively impact Subcontractor.

The Subcontractor shall include this clause in all consulting agreements and subcontracts of any tier that are utilized during the performance of the Work. The terms "contract", "Contractor", and "Contracting Officer" within any of the above referenced laws or regulations shall be appropriately modified to preserve JGO's rights.

For breach of nondisclosure or misrepresentation of any relevant facts required to be disclosed concerning conflicts of interest, JGO may terminate this Agreement and any Purchase Order or subsequent Change Order for Cause, disqualify the Subcontractor for subsequent related contractual efforts, and pursue such other remedies as may be permitted by law or this Agreement. If, however, in compliance with this clause, the Subcontractor discovers and promptly reports a conflict of interest (or potential thereof) subsequent to this Agreement and/or Purchase Order or Change Order award, the JGO Procurement Manager may permit continued performance under the Subcontractor's proposed plan of mitigation or terminate this Agreement for convenience if such termination is deemed to be in the best interests of JGO.

## 27.   ATTORNEY'S FEES

In the event that a dispute arises with respect to this Agreement, the Party prevailing in such dispute shall be entitled to recover all expenses, including, without limitation, reasonable attorney's fees and expenses, incurred in ascertaining such Party's rights or in preparing to enforce, or in enforcing, such Party's rights under this Agreement, whether or not it was necessary for such Party to institute suit.

## 28.   LIQUIDATED DAMAGES AND PENALTIES

Provisions or conditions for Liquidated Damages and Penalties must specifically be set forth within a Purchase Order which is agreed to by the Parties. The Purchase Order shall set forth all details in regard to Liquidated Damages or Penalties in terms of how and when they are to be assessed.

## 29.   LIMITATION OF LIABILITY

Except for each party's obligation to indemnify for certain damages awarded to third parties under sections 10, 13, and 19, and for any breach of section 2, or 14 neither party shall have any liability to the other for incidental, consequential, indirect, special, or punitive damages or liabilities of any kind.

## 30.   INTERPRETATIONS OR INCONSISTENCIES

It shall be the obligation of each Party to exercise due diligence to bring to the attention of the other Party at the earliest possible time any ambiguities, discrepancies, inconsistencies, or conflicts regarding the language or requirements of this Agreement or between any documents arising out of this Agreement. Any inconsistency in this Agreement or any Purchase Order shall be resolved by giving precedence in the following order: (a) Purchase Order to include all attachments and exhibits; (b) this Agreement; (c) representations and other instructions; (d) other

Initials: _____ RSLS _____ Janus

documents, exhibits, and attachments; and (e) the specifications. Sections of this Agreement mislabeled or referenced incorrectly shall not affect their validity. If any portion of this Agreement is deemed invalid, such a determination will not affect the validity of the rest of this Agreement.

## 31. ENTIRE AGREEMENT

This Agreement, including all attachments duly incorporated herein, constitutes the entire Agreement between the Parties and supersedes all previous agreements and understandings related to any Work to be or might be performed under this Agreement. Execution of this Agreement or any Purchase Order via facsimile or electronic scan delivered via email is permitted and will not affect the validity of said Agreement or Purchase Order.

## 32. NOTICES

All notices, requests, instructions, or other communication regarding the performance of any Work or matter under this Agreement ("Notice") shall be given in writing to the authorized representatives designated in the Purchase Order for matters relating to Purchase Order performance. All other Notices shall be given in writing to the representatives of the Parties as designated below.

<u>To Company Authorized Representative:</u>

Subcontracts - Michael S. Phillips      Technical – Randy Leonard
11921 Freedom Drive, Suite 1000      2265 Old Highway 95
Reston, Virginia 20190      Lenoir City, TN 37771
michael.phillips@caliburnintl.com      randy.leonard@janus.com
571-353-2826      571-969-8859

<u>To Subcontractor Authorized Representative:</u>

Adam Doolittle
13/5 HaMelacha St.
Lod, Israel,
adam@rs-ls.com
301-418-8957

## 33. APPLICABLE CONTRACT "FLOW DOWN" CLAUSES FROM JGO TO THE SUBCONTRACTOR

Information set forth in this section will be determined and provided by an authorized JGO representative. Such information includes FAR Flow downs and Special Conditions to be incorporated as directed by JGO's client contact, and provided as Exhibit A.

## SIGNATURES OF THE PARTIES ARE SET FORTH ON THE FOLLOWING PAGE

Initials: _____ RSLS _____ Janus

Form #13-004b
DC #42717      25
October 18, 2018
Revision: 10

Case 3:21-cv-00178-DCLC-HBG    Document 21-1    Filed 06/30/21    Page 25 of 26    PageID #: 95

IN WITNESS WHEREOF, the Parties hereto have indicated their acceptance to the terms and conditions of this Agreement, as of the day and year first above written, by placing the signature below of an authorized representative of each Party who is acknowledged as being authorized to bind and obligate their respective Company.

**R.S. Logistical Solutions**                    **Janus Global Operations LLC**

BY:                                              BY:

_Roy S._                                         _Michael S. Phillips_
_____                              _____

NAME:  Adam Doolittle                            NAME: Michael S. Phillips
TITLE:  CEO                                       TITLE: Subcontracts Administrator Sr.
DATE: 01/21/2020                                 DATE: 01/21/2020

Initials: _____  RSLS  _MSP_ Janus

Form #13-004b
DC #42717                          26
October 18, 2018
Revision: 10

Case 3:21-cv-00178-DCLC-HBG   Document 21-1   Filed 06/30/21   Page 26 of 26   PageID #: 96