UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| R.S. LOGISTICAL SOLUTIONS, LTD, | ) | |
| | ) | |
| | ) | 3:21-CV-00178-DCLC-HBG |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JANUS GLOBAL OPERATIONS, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants Janus Global Operations, LLC's ("JGO"), and Caliburn International, LLC's ("Caliburn"), Motion to Dismiss [Doc. 21]. Plaintiff R.S. Logistical Solutions, Ltd ("RSLS") responded [Doc. 24], and Defendants replied [Doc. 26]. This matter is now ripe for resolution.

I. **BACKGROUND**

Plaintiff RSLS is an Israeli limited liability company that provides logistical and life support services as a subcontractor on government projects [Doc. 1, ¶ 5]. Defendant JGO is a Delaware limited liability company with its principal office in Lenoir City, Tennessee [*Id.*, ¶ 6]. JGO provides management services to government agencies operating around the world and serves as a prime contractor on projects for the United States government. Defendant Caliburn is also a Delaware limited liability company based in Reston, Virginia, and is a holding company for JGO and Sallyport Global Holdings ("Sallyport") [*Id.*, ¶ 7].

In April 2019, the U.S. Department of State issued the "Somalia Task Order" ("STO") in which it sought bids for a "secure residential compound and associated life support services within

1

a 15-minute drive of the International Campus ("IC") at the Mogadishu International Airport ("MIA") compound" in Somalia [*Id.*, ¶ 13]. At that time, Bancroft Global Development ("Bancroft") was providing those services as a subcontractor to SOC, LLC ("SOC") [*Id.*]. In response to the State Department's task order, JGO submitted a bid as a general contractor. In its bid to the State Department, JGO included RSLS's quote to provide "life-support services" [*Id.*, ¶ 17]. SOC also submitted a competitive bid on the task order. Ultimately, the State Department selected JGO as the general contractor for its STO. SOC then unsuccessfully protested the award.[1] JGO defended against SOC's unsuccessful protest with RSLS's help.

In its quote to JGO, RSLS proposed "the SKA Home Lodge" as the location for the secure residential compound. SKA was an organization that RSLS partnered with for work in the area. Because of that, RSLS cautioned JGO "to exercise discretion with respect to SKA because it was a relatively young, strategic relationship that RSLS was cultivating . . . in Somalia." [*Id.*, ¶ 18].

On January 21, 2020, JGO and RSLS signed a Master Subcontract Agreement ("MSA") in which RSLS agreed to provide, consistent with the STO requirements, "a secure housing compound complete with apartment units to fully accommodate [JGO's] anticipated staffing requirements over a five-year period." [Docs. 1, ¶ 40; 21-1, pg. 2]. Before RSLS could perform any work, JGO and RSLS agreed to execute a Purchase Order, which would define the scope of work. No work could be performed prior to all parties executing a Purchase Order. The MSA authorized JGO "to immediately suspend all or any part of the Work by providing [RSLS] with written advanced Notice that is consistent with any advance notice allowed by [JGO's] customer" and required RSLS to promptly comply with JGO's directives [Doc. 21-1, pg. 15].

---

[1] "A bid protest is a challenge to the award or proposed award of a contract for the procurement of goods and services or a challenge to the terms of a solicitation for such a contract." https://www.gao.gov/legal/bid-protests/faqs (last accessed Jan. 7, 2022).

2

Under the MSA, JGO could terminate "the Agreement or a Purchase Order with or without cause . . . upon written notice." [*Id.*]. For terminations without cause, RSLS could recover for work performed through the date of termination plus any reasonable costs it actually incurred related to the termination [*Id.*]. JGO agreed not to terminate "for convenience" unless JGO's customer did so or to "avoid a termination for default from [JGO's] customer in which case the Parties agree[d] to discussions at Senior Management levels prior to [JGO] issuing [RSLS] a Termination for Convenience." [*Id.*].

At some point in the middle of January 2020, Thomas Heasley, a Senior Vice President with Caliburn, travelled to Dubai and met with SKA's owner. Heasley previously worked for SOC, Bancroft's parent company. [Doc. 1, ¶ 36]. RSLS claims Heasley asked about SKA's commitment to working with RSLS [*Id.*, ¶ 49]. SKA's owner responded that SKA was committed to working with RSLS. On January 23, 2020, Heasley expressed dissatisfaction with RSLS's selection of the SKA Home Lodge "in its then-unrefurbished condition." [*Id.*, ¶ 51]. On that same date, JGO asked RSLS to sign the first Purchase Order on the STO. This would release approximately $258,000 for RSLS to begin construction. But RSLS declined to sign the Purchase Order because it believed it was "now fraught with enormous financial risks for [it] given the indications that Heasley/Caliburn were now opposed to JGO's performance of the newly-signed MSA." [*Id.*, ¶ 54].

On February 2, 2020, Caliburn expressed uncertainty about the STO and wanted to schedule a phone call between the senior management with RSLS [*Id.*, ¶ 57]. RSLS claims that call never occurred. Instead, on February 4, 2020, Heasley emailed RSLS a "Termination for Convenience" in which he advised RSLS that JGO was terminating the Purchase Order for convenience. [*Id.*, ¶ 61]. RSLS claimed that grounds did not exist to support a termination for

3

convenience under the MSA. RSLS considered the email as a "suspension of work" and not a "termination for convenience" [*Id.*, ¶ 63].

In response, Sallyport's Procurement Director, Ned Lowry, advised RSLS that he believed senior management had spoken already and that the termination for convenience was "based on detailed discussions with [the State Department] wherein we believe we are taking steps to avoid a termination from the customer." [*Id.*]. Lowry agreed with RSLS's treatment of the email from Heasley as a suspension and not a termination.[2]

On February 13, 2020, Caliburn advised RSLS by email that the State Department was interested in changing the housing requirement for the project. [*Id.*, ¶ 74]. It informed RSLS that it "was being responsive to our customer's interest in evaluating another housing solution." [*Id.*]. On February 21, 2020, RSLS gave JGO written notice that a "full-fledged dispute" existed regarding "JGO's nonperformance of the MSA," and it proposed an informal resolution [*Id.*, ¶ 79]. RSLS asked for a response by March 9, 2020. On March 10, 2020, JGO declined RSLS's request for an informal resolution.

On May 16, 2020, Caliburn advised RSLS that "the Department of State modified our Mogadishu WPS contract directing a housing solution consistent with their stated desire vice [sic] our proposed solution." [*Id.*, ¶ 86]. RSLS requested "documentation to substantiate" the State Department's modification of the housing location. [*Id.*, ¶ 88]. Its requests were ignored. Later, RSLS learned that JGO contracted with Bancroft to provide the residential services that RSLS originally had agreed to provide. RSLS then brought this suit.

---

[2]  Lowery advised RSLS that JGO "absolutely support[ed RSLS's] request to reclassify the contractual direction to a suspension and believe[d] it makes sense in light of the fact that the conditions on the ground in Mogadishu are continually changing and because we 're both committed to working together on this contract where we can." [Doc. 1, ¶ 63]. He further wrote "[w]e also believe that further discussions are warranted as relates to the current contract." [*Id.*].

4

Counts I-III of RSLS's Complaint are only against JGO. In Count I, RSLS alleges JGO breached the MSA by denying it the ability to take corrective action provided in Article I of the MSA. It also alleges that JGO failed to provide written notice of any "Termination for Convenience" and that JGO's ability to terminate for convenience is limited to those outlined in the MSA, which it alleges did not exist. In Count II, RSLS alleges JGO breached an implied covenant of good faith and fair dealing. Here RSLS claims JGO was obligated to give RSLS a reasonable opportunity to perform under the MSA. In Count III, RSLS alleges that JGO anticipatorily repudiated the MSA.

Counts IV and V are only against Caliburn. In Count IV, RSLS alleges that Caliburn tortiously interfered with RSLS's contract with JGO. It alleges that Caliburn "orchestrated the conditions to prevent JGO's performance of the MSA and wrongfully attempted to supply a pretext for JGO to terminate the MSA for convenience." [*Id.*, ¶ 121]. In Count V, RSLS alleges that Caliburn induced JGO to breach the MSA.

The last count in the Complaint is a *quantum meruit* theory in which RSLS alleges that it expended considerable resources "before execution of the MSA and with the reasonable expectation, based on representations by JGO, that Plaintiff's provision of said services would be compensated and offset through the performance of the MSA." [*Id.*, ¶ 131].

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires the complaint to contain a "short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) eliminates a pleading or portion thereof that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) requires the Court to construe the allegations in the

complaint in the light most favorable to the plaintiff and accept all the complaint's factual allegations as true. *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 475 (6th Cir. 1990). The Court may not grant a motion to dismiss based upon a disbelief of a complaint's factual allegations. *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1990). The Court liberally construes the complaint in favor of the opposing party. *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995).

To survive dismissal, the plaintiff must allege facts that are sufficient "to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. Indeed, the Court does not consider whether the plaintiff will ultimately prevail but whether the facts permit the Court to infer more than the mere possibility of misconduct. *Id.* at 679. The court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), and dismissal is appropriate "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). In addition to the allegations contained in the complaint, a court may consider "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint" in ruling on a Rule 12(b)(6) motion to dismiss. *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001) (citation omitted).

### III. ANALYSIS

#### A. Count I - RSLS's breach of contract claim

Under Tennessee law, "[i]n a breach of contract action, claimants must prove the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and

6

damages caused by the breach." *Federal Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011). Defendants argue RSLS has not stated a claim because they never authorized RSLS to begin work, and JGO had the right to terminate the MSA with or without cause.

RSLS argues that JGO breached the MSA in that: (1) it "disregarded RSLS's right to take corrective action under Section 1 of the MSA"; (2) JGO lacked a "contractual justification" for terminating the MSA; (3) JGO failed to provide written notice of termination; and (4) JGO terminated for convenience without having senior management level discussions prior to the termination. [Doc. 24, pg. 6]. For ease of reference, the Court address each alleged breach in turn.

### 1. Right to take corrective action

The relevant provision of Section 1 of the MSA provides as follows:

> Subcontractor shall immediately respond to any *request or notification* made by JGO to take corrective action to correct any defect, material or otherwise; problem; alleged breach; schedule of the Work; or contract/performance requirement issue; and thereafter, take immediate steps to take corrective action. Failure by Subcontractor to immediately respond *to a request to take corrective action* and/or immediately take corrective action acceptable to JGO may result in Termination of this Agreement or any applicable Purchase Order subject to the provisions of this Agreement and or the relevant Purchase Order.

[Doc. 21-1, pg. 2] (emphasis added). RSLS argues this provision gave it the right to take corrective action prior to JGO exercising its right to terminate the MSA. JGO disagrees. "In 'resolving disputes concerning contract interpretation, [the Court's] task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language.'" *Planters Gin. Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890–91 (Tenn. 2002) (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). "The literal meaning of the contract language controls if the language is clear and unambiguous." *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013); *see also Franklin Am. Mortg. Co. v. Univ. Nat'l Bank of Lawrence*, 910 F.3d 270, 282 (6th Cir. 2018) (observing that where the contract

7

language is clear and unambiguous, the literal meaning controls the outcome of the dispute because it is the best indicator of the parties' intent under Tennessee law).

But if the contract is ambiguous, Tennessee courts apply "established rules of construction to determine the parties' intent." *Planters Gin Co.*, 78 S.W.3d at 890. "[I]n reviewing a contract for ambiguities, the court considers the contract as a whole." *Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc.*, 368 F.3d 894, 897–98 (6th Cir. 2004) (citing *Williamson County Broad. Co. v. Intermedia Partners*, 987 S.W.2d 550, 552 (Tenn. Ct. App. 1998)). "'A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one. A strained construction may not be placed on the language used to find ambiguity where none exists.'" *Id.* (quoting *Farmers–Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)). Nor is a contract "'rendered ambiguous simply because the parties disagree as to the interpretation of one or more of its provisions.'" *Id.* at 898 (quoting *International Flight Ctr. v. City of Murfreesboro*, 45 S.W.3d 565, 570 n. 5 (Tenn. Ct. App. 2000)).

RSLS argues the MSA gave it the right to take corrective action. But Section 1 of the MSA only requires RSLS to "immediately respond to any request or notification made by JGO to take corrective action." [Doc. 21-1, pg. 2]. Its duty to take corrective action is only triggered by JGO's request for it to take such action. Moreover, RSLS's reading that JGO was required to permit it to take corrective action prior to any termination is not consistent with the other provisions of the MSA that permit JGO to terminate for no reason at all. It is well settled under Tennessee law that provisions in a contract "should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract." *Fisher v. Revell*, 343 S.W.3d 776, 779 (Tenn. Ct. App. 2009) (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). In that regard, Article 12 authorized JGO "to terminate [the MSA] or a

8

Purchase Order with or without cause . . . upon written notice." [Doc. 21-1, pg. 15] The caveat here is that, if JGO terminated the MSA "without cause," then JGO had to pay RSLS for the work performed plus reasonable costs actually incurred.[3] A plain reading to the MSA does not give RSLS the right to take corrective action in the absence of a request from JGO. And RSLS does not allege that JGO ever asked it to take any corrective action in regard to the location of the residential facility. Thus, per the MSA, JGO was not obliged to give RSLS an opportunity to correct any issues with its proposal. Defendants' motion to dismiss is **GRANTED** in this respect.

2. **JGO lacked a "contractual justification" for terminating the MSA**

RSLS claims that JGO breached the MSA because it lacked a contractual justification for terminating the MSA. The MSA provides as follows:

> JGO shall have the right at any time to terminate this Agreement or a Purchase Order with or without cause (a "Termination"), upon written notice (e.g. "Termination," "Termination Notice," "Termination for Convenience," or "Termination for Cause"), [sic] A Termination may take place while a Suspension or Stop Work Order is in effect.

[*Id.*]. The MSA permits JGO to terminate the Agreement with or without cause and it does not provide a specific time before it is effective. The plain terms of the MSA do not support RSLS's position on the *ability* of JGO to terminate the MSA. The MSA plainly gave JGO that ability. However, the MSA makes a crucial distinction in whether the termination is with or without cause.

Whether the termination was with or without cause determines the damages available to RSLS. Caliburn and JGO contend "the complaint makes clear that JGO followed the MSA and terminated for convenience in order to avoid a termination for default from JGO's customer."

---

[3] Article 12 also gave JGO "the absolute right at any time to immediately suspend all or any part of the Work by providing [RSLS] with written advanced Notice." [Doc. 21-1, pg. 15]. If JGO "suspended" work, then JGO was obligated to pay RSLS "for Work performed prior to the Suspension" and "compensation for reasonable costs actually incurred as a result of the Suspension." [Doc. 21, pg. 15].

9

[Doc. 26, pg. 2]. But RSLS disputes their claim that the State Department was threatening termination of their contract. Indeed, RSLS alleges Defendants did not provide any evidence that that the State Department found the RSLS's residential site unacceptable. RSLS claims the MSA limited JGO's ability to terminate for convenience only "in order to avoid a termination for default from JGO's customer." [Doc. 21-1, pg. 15]. And RSLS claims that the State Department had not threatened to terminate JGO.

At this stage in the proceedings, the Court cannot resolve this issue as it must accept RSLS's allegations as true. Assuming that Defendants terminated the MSA without cause, the next issue is what damages are available to RSLS. Defendants claim that RSLS's damages are zero because it could not have done any work without a Purchase Order. And, because RSLS never executed a Purchase Order, it could never do any work.

But it is not clear that is the necessary result. Section 12, "Suspension and Terminations," of the MSA permits JGO to suspend "all or any part of the Work by providing . . . written advanced Notice." It also permits JGO to "terminate *this Agreement or a Purchase Order* with or without cause." [*Id.*] (emphasis added). It further provides that "[i]f the Termination is without cause, Subcontractor shall be compensated for Work performed through the date set forth in the Termination Notice plus reasonable costs incurred by Subcontractor as a result of the termination."

First, there is no doubt that RSLS cannot recover damages for the termination of a Purchase Order because RSLS never agreed to perform any work and never signed a Purchase Order authorizing it to perform work. RSLS and JGO had to execute a Purchase Order in order for RSLS to perform any work. JGO asked RSLS to agree to the first Purchase Order, but for its own reasons, RSLS declined to sign the Purchase Order and refused to go forward with the work.

It is not clear, however, whether RSLS would otherwise be entitled to damages as a result

10

of Defendants terminating the MSA without cause. The MSA contemplates a scope of work the parties agreed RSLS would perform. In fact, the MSA required RSLS to "assign a full time Program Manager (PM) who is the senior-most individual on the contract." [*Id.*, pg. 5]. It is reasonable to assume RSLS would incur costs associated with the scope of work as detailed in the MSA even though it might not have incurred any costs associated with Purchase Orders. Thus, it is not clear at this stage what, if any, damages RSLS would be entitled to for a termination of the MSA without cause. RSLS has sufficiently pleaded a cause of action for damages on this theory, and Defendants' motion to dismiss is **DENIED** in this respect.

   3.   **Terminating without written notice or senior management level discussions**

RSLS argues that Defendants breached the MSA by terminating the Agreement without written notice and without having senior management level discussions prior to termination. In this case, the MSA did not establish a notice period—only that written advanced notice was required. It is a fundamental rule in Tennessee that a party to a contract may recover all damages that are reasonably foreseeable for the breach of that contract. *Wilson v. Dealy*, 434 S.W.2d 835, 838 (Tenn. 1968); *Moore Const. Co., Inc. v. Clarksville Dep't of Elec.*, 707 S.W.2d 1, 14 (Tenn. Ct. App. 1985); *National Door & Hardware Installers, Inc. v. Mirsaidi*, 2014 WL 3002007, at *5 (Tenn. Ct. App. June 30, 2014). When it is the failure to give reasonable notice of termination rather than the termination itself which constitutes the breach of contract, the damages are limited to that failure. *McKee Foods Corp. v. Aryzta, LLC*, No. 1:17-CV-280-CHS, 2019 WL 12023209, at *7 (E.D. Tenn. Aug. 22, 2019), *order amended on reconsideration*, No. 1:17-CV-00280-CHS, 2020 WL 9074718 (E.D. Tenn. Sept. 14, 2020). At this point, the Court cannot say that RSLS has not been damaged at all by Defendants' failure to engage in senior management level discussions or to give written notice of termination. Thus, Defendants' motion to dismiss on that ground is

11

**DENIED**.

**B.     Count II – Implied covenant of good faith and fair dealing**

RSLS claims here that JGO had the duty to give them a chance to perform under the MSA. In Tennessee, "[p]arties to a contract owe each other a duty of good faith and fair dealing as it pertains to the performance of a contract." *Barnes & Robinson Co. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 642 (Tenn. Ct. App. 2006) (citing *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996)).  This implied-in-law covenant has two purposes: (1) it honors the contracting parties' reasonable expectations; and (2) it protects the rights of the parties to receive the benefits of the agreement they entered into. *Barnes & Robinson Co.*, 195 S.W.3d at 642 (citations omitted).

Notably, a breach of the implied covenant of good faith and fair dealing is not an independent basis for relief but "may be an element or circumstance of recognized torts, or breaches of contracts." *Solomon v. First Am. Nat'l Bank of Nashville*, 774 S.W.2d 935, 945 (Tenn. Ct. App. 1989) (discussing how "it does not appear that good faith, or the lack of it . . . standing alone, [is] an actionable tort"); *see also Envoy Corp. v. Quintiles Transnat'l Corp.*, No. 3:03cv0539, 2007 WL 2173365, at *8 (M.D. Tenn. July 26, 2007) (finding that "absent a valid claim for breach of contract, there is no cause of action for breach of an implied covenant of good faith and fair dealing").  Here, the Court is permitting the breach of contract action to proceed. Accordingly, Defendants' motion to dismiss is **DENIED** in this respect.

**C.     Count III – Anticipatory Breach**

Defendants contend that JGO properly terminated the Agreement with RSLS [Doc. 21, pg. 9].  They state that "there is no anticipation that [JGO] will not perform its duties under a contract because there is no contract." [*Id.*].  Defendants assert that a breach cannot be anticipated for a

12

contract that is not in effect [*Id.*]. RSLS responds that it has stated a claim for anticipatory repudiation because of Defendants' actions preceding the dissolution of the Agreement [Doc. 24, pgs. 12-13].

A party to a contract can take certain actions or make certain statements that repudiate it. "Such a repudiation can occur when a party commits a voluntary act which renders the party unable or apparently unable to perform the contract, or when the words and conduct of the contracting party amount to a total and unqualified refusal to perform the contract." *UT Med. Grp, Inc. v. Vogt*, 235 S.W.3d 110, 120 (Tenn. 2007) (internal quotations omitted) (alterations adopted). When a repudiation occurs before the time that a contract requires a party to perform, the repudiating party has committed an anticipatory repudiation or an anticipatory breach of the contract. *Id.*

Here, JGO could terminate the MSA "with or without cause." And it could terminate the MSA at any point in time. The issue, however, is that it is not clear that JGO ever terminated the MSA. JGO sent a Termination for Convenience email, but it appears that JGO then treated it as a suspension and not a termination. Thus, while JGO could terminate the MSA, RSLS has alleged enough to survive this portion of Defendant's motion to dismiss. Accordingly, Defendants' motion to dismiss is **DENIED** in this respect.

D. **Counts IV and V - RSLS's tortious interference with contract and tortious inducement of breach of contract claims against Caliburn**

Defendants reiterate that there was no breach of contract [Doc. 21, pg. 10]. Next, they assert that the Complaint fails to allege any facts that meet the elements of tortious interference with a contract [*Id.*]. RSLS responds that it has stated claims for tortious interference with a contract and for tortious inducement of breach of contract [Doc. 24, pg. 13]. It notes Heasley's actions on behalf of Caliburn as establishing both claims [*Id.*, pg. 14-15].

13

To prevail on a claim of tortious interference with a contract, a plaintiff must show that: (1) there was a legal contract; (2) the defendant knew of the existence of the contract; (3) the defendant intended to induce a breach of the contract; (4) the defendant acted maliciously; (5) the contract was actually breached; (6) the defendant's actions were the proximate cause of the breach; and (7) the plaintiff suffered damages resulting from the breach. *Keith v. Aerus, LLC*, No. 2:09-CV-00297, 2010 WL 3883434, at *4 (E.D. Tenn. Sep. 29, 2010). Further, Tennessee law makes it unlawful for any person, "by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto." Tenn. Code Ann. § 47-50-109. In such cases, the inducing party is liable for treble damages resulting from the breach of the contract. *Id.* The elements for both a common law claim for tortious interference with a contract and a statutory claim for tortious inducement of breach of contract are the same, except that the statutory claim allows for treble damages. *Keith*, 2010 WL 3883434 at *4.

Here, RSLS has pleaded sufficiently a claim for tortious interference with a contract and tortious inducement of breach of contract. Specifically, RSLS has alleged that there was a contract between it and JGO, Caliburn knew of the contract's existence, Heasley intended to induce a breach and acted maliciously, JGO breached the contract, Caliburn's actions caused the breach, and RSLS suffered damages from JGO's breach. [Doc. 1, ¶¶ 40, 55-57, 61, 67, 86-87, 89, 92-95]. Indeed, the Complaint shows that Heasley, then employed as a Senior Vice President for Caliburn, indicated early on in the professional relationship between RSLS and JGO that JGO intended to cancel the MSA with RSLS. [*Id.*, ¶ 55]. Further, RSLS asserts that Heasley previously worked for SOC, Bancroft's parent company and the subcontractor that JGO would contract with after RSLS. [*Id.*, ¶ 36]. Those facts, taken together and construed in favor of RSLS at this stage of

14

litigation, pass the relatively low hurdle for pleading a claim sufficiently to survive a motion to dismiss. *See Miller*, 50 F.3d at 377 (holding that a district court must liberally construe the complaint in favor of the opposing party at the motion to dismiss stage). Accordingly, Defendants' motion to dismiss is **DENIED** in this respect.

E.   **Count VI - RSLS's *quantum meruit* theory of recovery**

Defendants argue that RSLS is not entitled to recover under a theory of *quantum meruit* [Doc. 21, pgs. 11-12]. They note that RSLS fails to reference any theory or allegation against Caliburn [*Id.*, pg. 11]. Defendants contend that RSLS cannot meet the elements of *quantum meruit* because an enforceable contract exists between the parties, and RSLS did not provide any valuable goods or services under the contract [*Id.*, pg. 11-12]. Additionally, Defendants argue that the MSA states that any expenses RSLS incurred outside of authorized work are not recoverable [*Id.*, pg. 12]. Lastly, Defendants assert that they are entitled to attorneys' fees under the Agreement [*Id.*, pg. 13].

RSLS responds that it has stated a claim for recovery under a *quantum meruit* theory [Doc. 24, pgs. 15-16]. It contends that Caliburn was a stakeholder and beneficiary of the goods and services it provided to Caliburn's subsidiary, JGO [*Id.*]. RSLS argues that it provided valuable goods and services by helping JGO win the bid for the STO and that it expected to be compensated for those services by JGO's performance of the Agreement [*Id.*, pg. 16]. Next, RSLS contends that its *quantum meruit* claim is in addition to the damages resulting from Defendants' alleged breach of the Agreement [*Id.*, pgs. 16-17]. Lastly, it states that Defendants' request for attorneys' fees should be denied along with their motion to dismiss [*Id.*, pg. 20]. Defendants reply that the Court should apply the damages provisions as agreed in the contract between the parties [*Id.*, pgs. 5-6].

A party who had a contract at one time may pursue a *quantum meruit* recovery if the contract is no longer enforceable. *Mitch Grissim & Assoc. v. Blue Cross & Blue Shield of Tenn.*, 114 S.W.3d 531, 537 (Tenn. Ct. App. 2002). Recovery under such a theory is based on a "legally implied promise to pay a reasonable amount for goods or services received and is therefore limited to the actual value of the goods or services received." *Id.* (internal quotations omitted). To recover under a *quantum meruit* theory, a plaintiff must show that: (1) there is no existing, enforceable contract between the parties covering the same subject matter; (2) it provided valuable goods and services; (3) the defendant must have received the goods and services; (4) the circumstances indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and (5) the circumstances demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them. *Id.* at 537-38. Recovery under *quantum meruit* is measured by the benefit conferred on the defendant. *Id.* at 538.

Here, RSLS has pleaded sufficiently a claim for recovery under *quantum meruit*. RSLS explains that it seeks to recover the value of the services it provided to JGO, and by extension Caliburn, in helping defend against SOC's bid protest. [Doc. 24, pgs. 15-16]. The Complaint shows, at this state of litigation, that: (1) there is no existing, enforceable contract between the parties as to the services that RSLS provided in defending against the bid protest; (2) RSLS provided a valuable service to JGO by helping it defend against the bid protest and retain the STO; (3) the parties expected that RSLS would be compensated through performance of the Agreement; and (4) it would be unjust for JGO to retain the STO with RSLS's help but fail to compensate RSLS for that help. [Doc. 1, ¶¶ 28-33]. Further, Defendants' arguments about RSLS's damages at this stage of litigation are inapposite because RSLS properly asserts it suffered more than

16

$253,000 in out-of-pocket damages and more than $5.3 million in lost profits. [*Id.*, ¶¶ 92-95]. Accordingly, Defendants' motion to dismiss is **DENIED** in this respect.

IV. **CONCLUSION**

For the reasons stated herein, Defendants' Motion to Dismiss [Doc. 21] is **GRANTED** in part and **DENIED** in part.

SO ORDERED:

                                          s/ Clifton L. Corker
                                          United States District Judge

17

Case 3:21-cv-00178-DCLC-HBG   Document 35   Filed 01/28/22   Page 17 of 17   PageID #: 176