UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| R.S. LOGISTICAL SOLUTIONS, LTD, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> JANUS GLOBAL OPERATIONS LLC, and ) <br> CALIBURN INTERNATIONAL, LLC, ) <br> ) <br> Defendants. ) | No. 3:21-CV-178-DCLC-JEM |

**MEMORANDUM AND ORDER**

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court are Plaintiff's Motion to Compel [Doc. 42] and Defendants' Motion for Protective Order [Doc. 49]. By way of background, on May 16, 2022, the parties participated in an informal discovery conference pursuant to section 4(g) of the Scheduling Order [Doc. 41]. During the informal conference, the parties addressed the issues now before the Court. Given the nature of the disputes and the parties' positions, the Court granted the parties leave to file motions [*Id.*]. The motions are ripe for adjudication [*see* Docs. 52, 53, 57 & 59], and for the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion to Compel [**Doc. 42**] and **DENIES** Defendants' Motion for Protective Order [**Doc. 49**].

**I.     BACKGROUND**

This case arises from an alleged breach of contract and related torts. Plaintiff provides logistics and specialized mission support services to federal agencies and military forces operating in volatile areas throughout the developing world [Doc. 1 ¶ 1]. Defendant Janus Global

1

Operations, LLC ("JGO") provides mission support and program management services to government agencies operating around the world and has served as a prime contractor for multiple United States federal agency task orders [*Id*. ¶ 6]. Defendant Caliburn International, LLC ("Caliburn") is JGO's holding company [*Id*. ¶ 7].

In April 2019, the United States Department of State ("DOS") issued Request for Proposals No. 19AQMM19R0112 seeking bids for protective guard services, status guard services, and specialized security services to be provided at the U.S. Mission Somalia (the "Somalia RFP") [*Id*. ¶ 12]. The Somalia RFP contemplated the issuance of a hybrid fixed-price, cost-reimbursement type task order for a base year and four one-year options ("Somalia Task Order") [*Id*.]. Among the Somalia RFP's requirements was the provision of a secure residential compound and associated life support services within a fifteen-minute drive of the International Campus ("IC") at the Mogadishu International Airport ("MIA") compound [*Id*. ¶ 13].

On May 10, 2019, JGO submitted its Somalia Task Order proposal ("Task Order Proposal") to the DOS, which included Plaintiff's proposal that housing be located at the SKA Home Lodge ("SKA Compound"), a facility owned by SKA Somalia ("SKA") [*Id*. ¶¶ 18, 22]. In September 2019, the DOS awarded the Somalia Task Order to JGO over SOC, LLC ("SOC"), the former contractor for the existing Somalia Task Order [*Id*. ¶¶ 13, 26]. SOC filed a bid protest, which JGO was able to successfully counter with Plaintiff's assistance [*Id*. ¶¶ 28, 30–33].

On January 21, 2020, Plaintiff and JGO signed the Master Services Agreement ("MSA") [*Id*. ¶ 40]. A few days later on January 23, 2020, following a trip from Somalia, Thomas Heasley ("Heasley"), Caliburn's Senior Vice President, emailed JGO's project manager, Randy Leonard ("Leonard"), providing a negative assessment of the SKA Compound in its then-unrefurbished condition [*Id*. ¶ 51]. On the same day, JGO asked Plaintiff to sign and return Purchase Order

2

Case 3:21-cv-00178-DCLC-JEM   Document 65   Filed 08/26/22   Page 2 of 15   PageID #: 603

No. Somalia 001 ("PO1"), which released funding for the mobilization of Plaintiff to begin construction of the SKA Compound on February 4, 2020 [*Id.* ¶ 52]. In late January, Heasley indicated to Leonard that JGO would be cancelling the MSA with Plaintiff and would instead subcontract with Bancroft Global Development ("Bancroft"), a subcontractor of SOC, to provide the secured housing at the IC [*Id.* ¶ 55].[1] Roy Shaposhnik ("Shaposhnik"), Plaintiff's owner and president, informed JGO that executing the PO1 was now fraught with enormous financial risks given Heasley's and Caliburn's indications that they were opposed to the MSA [*Id.* ¶ 54].

The parties continued to exchange communications, and on February 4, 2020, JGO emailed a letter to Plaintiff titled, "Termination for Convenience," which invoked Article No. 12 of the MSA [*Id.* ¶ 61]. Article 12 allowed JGO to terminate the MSA if (1) JGO's customer terminates for convenience, or (2) to avoid a termination for default from JGO's customer in which case the parties agreed to discuss prior to JGO issuing the termination [*Id.* ¶ 43]. Plaintiff disputed the Termination for Convenience letter, stating that JGO "provided no information indicating that the conditions justifying termination exist" [*Id.* ¶ 62]. Plaintiff wrote that it construed the Termination of Convenience letter as a suspension of work notice [*Id.*]. On February 4, 2020, Ned Lowry ("Lowry"), the Procurement Director for one of Caliburn's holding companies, responded to Plaintiff that JGO had "detailed discussions with our customer wherein we believe we are taking steps to avoid a termination from the customer" [*Id.* ¶ 63]. JGO agreed with Plaintiff, however, that the Termination for Convenience should be construed as a suspension [*Id.*].

Plaintiff alleges that for the next three and a half months, "Caliburn actively undermined, and JGO refused to perform, the MSA, while repeatedly expressing a variety of vague concerns, equivocations, and doubts regarding the SKA Compound's acceptability to the DOS [*Id.* ¶ 67].

---

[1] The Complaint alleges that prior to Heasley joining Caliburn, he worked at SOC [Doc. 1 ¶ 36].

3

Case 3:21-cv-00178-DCLC-JEM   Document 65   Filed 08/26/22   Page 3 of 15   PageID #: 604

On May 16, 2020, Heasley emailed Shaposhnik stating "yesterday the [DOS] modified our Mogadishu WPS contract directing a housing solution consistent with their stated desire vice [sic] our proposed solution" [*Id.* ¶ 86]. Later, Shaposhnik learned that JGO formally engaged Bancroft as its subcontractor [*Id.* ¶ 89].

Plaintiff alleges breach of contract against JGO, breach of implied covenant of good faith and fair dealing against JGO, anticipatory repudiation against JGO, tortious inference with contract against Caliburn, tortious inducement of breach of contract pursuant to Tenn. Code Ann. § 47-50-109, and quantum meruit against both Defendants [*Id.* ¶¶ 96–132].

The parties are now engaged in discovery disputes, and they have filed competing motions. At the heart of the parties' disputes is whether Defendants must produce communications to/from the DOS, Defendants' customer. Plaintiff has filed the Motion to Compel [Doc. 42], requesting that the Court compel Defendants to respond to Request for Production ("RFP") Nos. 1, 2, 3, 11, and 17 and Interrogatory Nos. 1, 2, and 10. Defendants have responded in opposition [Doc. 53], and Plaintiff has replied [Doc. 57]. Defendants have filed a motion for protective order [Doc. 49], requesting that the Court enter a protective order to relieve them of the obligation to produce documents and communications to/from the DOS. Plaintiff has responded in opposition [Doc. 52], and Defendants have replied [Doc. 59].

## II. ANALYSIS

Federal Rule of Civil Procedure 26(b)(1) provides as follows:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues,

and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Courts have explained that the "scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad." *Meredith v. United Collection Bureau, Inc.*, 319 F.R.D. 240, 242 (N.D. Ohio 2017) (quoting *Lewis v. ACB Bus. Serv., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998)). Courts have cautioned, however, that "[d]iscovery requests are not limitless, and parties must be prohibited from taking 'fishing expeditions' in hopes of developing meritorious claims." *Bentley v. Paul B. Hall Reg'l Med. Ctr.*, No. 7:15-CV-97-ART-EBA, 2016 WL 7976040, at *1 (E.D. Ky. Apr. 14, 2016). "[T]he [C]ourt retains the final discretion to determine whether a discovery request is broad or oppressive." *Id.* (citing *Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007)).

Rule 26(c) governs protective orders. It authorizes a court to enter an order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). A party requesting a protective order must establish good cause for such an order. *Eagle v. Hurley Med. Ctr.*, 292 F.R.D. 466, 478 (E.D. Mich. 2013). "Good cause may exist if 'specific prejudice or harm will result' from the absence of a protective order." *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 236 (6th Cir. 2016) (quoting *Father M. v. Various Tort Claimants*, 661 F.3d 417, 424 (9th Cir. 2011)). "This Rule confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Eagle*, 292 F.R.D. at 478 (citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984)).

Defendants object to producing their communications with the DOS on two grounds. First, Defendants submit that they are contractually bound to maintain these communications in confidence. Second, Defendants assert that Plaintiff's discovery requests seek a significant volume of material that is not relevant to the parties' claims or defenses or proportional to the

5

needs to this case. The Court has considered the parties' positions in this matter, and the Court will grant in part Plaintiff's Motion to Compel [Doc. 42] and will deny Defendants' Motion for Protective Order [Doc. 49]. The Court finds that Defendants have not established good cause for a protective order to relieve them of the obligation to produce relevant and non-privileged communications and documents to/from the DOS. The Court further finds that Defendants' communications and documents to/from the DOS relating to the residential compound and associated life support services are relevant but that the parties need to meet and confer to discuss the specific parameters of Plaintiff's discovery requests.

A.  **Protective Order**

Defendants state that the dispute relates to RFP Nos. 2 and 11 and Interrogatory No. 1, which request them to identify communications and correspondence and produce documents and communications to/from the DOS.[2] Defendants assert that they cannot produce the requested information without violating a contractual obligation (i.e., "a strict confidentiality provision") owed to the DOS, a key customer [Doc. 49 p. 3]. While Defendants are not asserting any privileges, they claim they cannot produce the documents because of the confidentiality provision.[3]

Defendants maintain that their contractual obligation to keep communications in strict confidence is in direct tension with their discovery obligations. They fear that violating the confidentiality provision will result in serious financial and reputation risks. For instance, Defendants assert that violating their contractual obligations could place the entire

---

[2]  Defendants add that their motion is also intended to cover any discovery request that "may in part call for Defendants' communications with DOS" [Doc. 49 p. 6 n.5].

[3]  Defendants rely on language in the contract with the DOS to support the request for a protective order, but the Court has not included this language in this Memorandum and Order because it is under seal [Docs. 48, 54 & 58].

6

contract—not just the Somalia Task Order—at risk. The Somalia Task Order alone is estimated to be worth in excess of $61 million and represents a significant value of Defendants' business [Doc. 49 p. 10 (citing Doc. 49-7 ¶ 10)]. But even beyond the financial harm of potentially losing their Somalia Task Order, Defendants assert they could also face serious reputational harm with one of their major customers, be competitively harmed by jeopardizing other existing DOS contracts, and impair their ability to seek future government contracts [*Id*. at 9].

According to Defendants, Plaintiff should seek these documents directly from the DOS because the DOS is in the best position to determine whether there are legitimate reasons to resist the production. They suggest that Plaintiff can use the *Touhy* process to seek the requested discovery from the proper source (i.e., the DOS), but they do not claim that *Touhy* or the DOS's regulations relieve them of their discovery obligations. Should the Court deny Defendants' request to enter a protective order, they request that the Court (1) allow the parties to negotiate a stipulated protective order governing this (and other) sensitive material, and (2) afford the DOS an opportunity to be heard concerning any documents Defendants may identify for production.

In response, Plaintiff maintains that third-party confidentiality agreements do not supersede the Federal Rules. Plaintiff asserts that Defendants do not provide any authority or examples showing why this Court should deviate from the typical process of handling discovery involving information subject to contractual nondisclosure obligations. Plaintiff further asserts that while Defendants seek a protective order to relieve them of their discovery obligations, the appropriate resolution is to submit a conventional protective order to maintain the confidentiality of any sensitive information.

While the Court understands Defendants' position, and predicament, confidentiality restrictions in contracts do not override the Federal Rules of Civil Procedure.

7

*O'Hara & Assocs., LLC v. Winzeler, Inc.*, No. 16-11708, 2017 WL 11423043, at *2 (E.D. Mich. Aug. 4, 2017) ("[A] private non-disclosure agreement cannot limit a court's ability to order discovery of relevant evidence."); *see also Shvartser v. Lekser*, 270 F. Supp. 3d 96, 98 (D.D.C. 2017) ("[C]onfidentiality agreements will not stand as a barrier to discovery between two parties in litigation." (citations omitted)). As explained by several courts, "'Confidentiality is not a recognized basis for withholding discovery' even when such a confidentiality restriction is imposed by a U.S. agency." *First Horizon Nat'l Corp. v. Houston Cas. Co.*, No. 2:15-CV-2235-SHL-DKV, 2016 WL 5867268, at *11 (W.D. Tenn. Oct. 5, 2016) (quoting *Hanas v. Inner City Christian Outreach Ctr., Inc.*, No. CIV.A. 06-CV-10290-D, 2007 WL 551609, at *2 (E.D. Mich. Feb. 20, 2007)); *see also Covad Commc'ns Co. v. Revonet, Inc.*, 258 F.R.D. 5, 11 (D.D.C. 2009) ("Confidentiality is not a basis for withholding information in the ordinary course if it can be protected by a protective order . . . restricting access . . . ."); *EEOC v. Roswell Radio, Inc.*, No. CV 04-729 BB/LCS, 2005 WL 8163666, at *2 (D.N.M. Sept. 19, 2005) ("But an objection based on confidentiality, like one based on relevancy, fails to meet the Rule's threshold requirement of demonstrating good cause.").

It "was probably prudent for [Defendants] to err on the side of caution in objecting to these discovery requests," *O'Hara & Assocs.*, 2017 WL 11423043, at *2, but Sixth Circuit law is instructive, if not dispositive of the issue before the Court.[4] In *In re Bankers Trust*, the defendant

---

[4] Defendants cite *Ross v. DynCorp.*, 362 F. Supp. 2d 344 (D.D.C. 2005), but they admit that *Ross* is distinguishable because it did not relate to a discovery dispute [Doc. 49 p. 9–10]. Instead, the court in *Ross* granted summary judgment to the defendant on the plaintiffs' intentional infliction of emotional distress claim because the defendant's actions stemmed from legitimate business reasons as opposed to extreme and outrageous conduct. *Id.* at 364. The court concluded that the defendant's "belief that [a] contractual provision prevented it from giving the plaintiffs all of the information requested" was reasonable. *Id.* at 363. As Defendants concede, this case does not support Defendants' position that they may withhold relevant documents in litigation on the basis of contractual obligations.

objected to the plaintiff's discovery requests, which sought from the defendant all documents submitted to and from the Board of Federal Reserve ("Board"). 61 F.3d 465, 467 (6th Cir. 1995). The defendant claimed the documents were the property of the Board and that under the Board's regulations, the defendant was prohibited from disclosing the documents. *Id*. The defendant also argued that the plaintiff had to request the documents directly from the Board. *Id*. at 469. The Sixth Circuit disagreed. *Id*. The Court explained that pursuant to Rule 34, the plaintiff was not required to seek the documents directly from the Board, explaining that "federal courts have consistently held that documents are deemed to be within the 'possession, custody or control' for purposes of Rule 34 if the party has *actual* possession, custody or control, or has the legal right to obtain the documents on demand." *Id*. (citation omitted). In addition, the Court found that the Board's regulation that prohibited disclosure of information inconsistent with the Federal Rules, and therefore, "cannot be recognized by this court." *Id*. at 470. It concluded, "[W]e find no compelling reason to discard the relatively straightforward discovery methods outlined in the Federal Rules of Civil Procedure simply because the Federal Reserve has attempted to mandate a different procedure." *Id*. at 470–71.

Defendants assert that *In re Bankers Trust* is inapposite because it involved a petition for a writ of mandamus to vacate a court order compelling production and it involved regulations as opposed to a confidential provision in a contract [Doc. 52 pp. 16–17]. But these distinctions are without a difference. In *First Horizon Nat'l*, 2016 WL 5867268, at *11, the plaintiffs withheld numerous documents from discovery, stating that the Department of Housing and Urban Development ("HUD") placed restrictions on the production of the documents to the defendants, which included prohibiting the plaintiffs from showing, releasing, or reproducing the requested documents. *Id*. at *11. The Western District of Tennessee held that "a government agency could

9

not override the application of the Federal Rules and prevent production of documents otherwise required under Rule 34." *Id*. (citing *In re Bankers Trust*, 61 F.3d at 470). Instead, "any confidentiality concerns are adequately addressed by a protective order." *Id*. Thus, the court ordered the plaintiffs to produce the documents. *Id*.

In light of this authority, the Court finds that the confidentiality provision in Defendants' contract with the DOS does not preclude the production of non-privileged communications and documents to/from the DOS that are relevant and proportionate to the needs of the case. *Diamond Resorts Int'l, Inc. v. Phillips*, No. 3:17-CV-01124, 2018 WL 3326814, at *2 (M.D. Tenn. Apr. 17, 2018) ("It is an 'unremarkable proposition,' however, 'that confidentiality agreements will not stand as a barrier to discovery between two parties in litigation.'" (quoting *Saini v. Int'l Game Technology*, 434 F. Supp. 2d 913, 922 (D. Nev. 2006))). But Defendants argue that their position is not based on confidentiality alone.

Defendants state that it would be more convenient, less burdensome, or less expensive to seek the documents directly from the DOS [Doc. 49 p. 11 n.6 (quoting Fed. R. Civ. P. 26(b)(2)(C)(i)]. The Sixth Circuit has rejected a similar argument. *See In re Bankers Tr.*, 61 F.3d at 471 ("It seems illogical to this court to require P&G to initiate the much more cumbersome procedure of serving a subpoena on the Federal Reserve in Washington, D.C. simply to enable P&G to obtain the same documents that defendant Bankers Trust possesses."); *see generally Raymond James & Assocs., Inc. v. 50 N. Front St. TN, LLC*, No. 18-CV-2104-JTF-TMP, 2018 WL 6528192, at *1 (W.D. Tenn. Sept. 10, 2018) ("[N]umerous courts have quashed subpoenas issued to non-parties when the requesting parties could have obtained the documents from other parties." (collecting cases)).

Defendants also argue that they will face undue burden if required to disclose the requested records, citing to the Declaration of Kelly McIntyre ("McIntyre"), senior counsel at Acuity International, LLC (formerly, Caliburn):

> 9. If Defendants were to produce communications with DOS concerning the Somalia Task Order and related issues without authorization, it would risk irreparable harm to Defendants' reputation and their ongoing business relationship with DOS, which also includes a similar WPS task order in Erbil, Iraq, and a medical-support contract for U.S. diplomats and military members in Iraq. Defendants also have pending a WPS proposal with DOS for source selection for a Baghdad embassy task order. All of these contracts and opportunities could be put at risk if Defendants are forced to produce the documents without government authorization.
>
> 10. The Somalia Task Order alone is expected to generate more than $61 million in revenue.

[Doc. 49-7 ¶¶ 9–10]. [5] The Court appreciates Defendants' concern that production could affect its reputation and ongoing relationship with the DOS. But at this point, Defendants' concerns are speculative. *Williams v. Baptist Healthcare Sys., Inc.*, No. 3:16-CV-00236-CRS, 2018 WL 989546, at *3 (W.D. Ky. Feb. 20, 2018) (finding that, while the affidavit provided "an explanation of harm that could occur, this type of harm is too speculative to constitute a clearly defined and serious injury" (internal quotations omitted)). Further, many of the allegations in this matter relate to what the DOS communicated to Defendants in terms of Plaintiff's services [*See infra* Section II.B.]. Defendants' concerns are outweighed by the importance of communications and documents to/from the DOS to this litigation.

The parties are amenable to negotiating a standard protective order, and the Court finds that a standard protective order is the most appropriate course of action as opposed to a complete

---

[5] The Court will discuss Defendants' concerns regarding the volume of production in Section B [*See* Doc. 49-7 ¶¶ 11–12].

prohibition on the production of relevant documents [Doc. 57 p. 7 (Plaintiff explaining that a conventional protective order would readily address Defendants' confidentiality concerns); Doc. 49 p. 14 (Defendants proposing, in the alternative, that the Court allow the parties to negotiate a stipulated protective order)].

For the reasons explained above, the Court **DENIES** Defendants' Motion for Protective Order [**Doc. 49**]. The Court **ORDERS** the parties to meet and confer and to submit a proposed protective order **within ten (10) days** of this order. If the parties cannot agree on the terms of protective order within that timeframe, they may contact chambers to set a hearing.

### B. Relevancy and Proportionality

Plaintiff seeks an order compelling Defendants to respond to RFP Nos. 1, 2, 3, 11, and 17 and Interrogatory Nos. 1, 2, and 10. Defendants objected to all of these discovery requests on the basis that their communications with the DOS are confidential. Defendants also argue that several of Plaintiff's discovery requests seek a significant volume of material that is not relevant the parties' claims and defenses, and as a result, are impermissibly overbroad. In addition, Defendants submit that Plaintiff's discovery requests are not proportional to the needs of the case given that several of the discovery requests seek "all documents" or "all communications" about a wide range of broad topics. For instance, Defendants state that "two of the most troubling requests" are RFP No. 2 and Interrogatory No. 1, which seek information beyond the Somalia Task Order [Doc. 51 p. 9]. Defendants state that "only a small subset of those communications—those related to the substitution of subcontractors for secured housing—may be relevant to this dispute" [*Id.*]. Relying on McIntyre's Declaration [Doc. 47-9], Defendants assert that Plaintiff cannot show proportionality.

Plaintiff counters that even a cursory review of the record in this case, including the pleadings and the dispositive motion filings, shows the demonstrable relevance of Defendants' communications with the DOS. Plaintiff states that documents that Defendants have produced reference communications with the DOS that implicate Defendants' legal obligations to Plaintiff under the MSA. In addition, Plaintiff argues that Defendants have not proposed any narrowing of the requests and have never conferred with Plaintiff regarding an alternative approach to responding to the requests. According to Plaintiff, McIntyre's Declaration is the first substantive, quantitative information Defendants have provided in explaining the purported burden involved in producing responsive documents, and Defendants should have proposed a more narrowly tailored revision months ago.

Upon review of Plaintiff's allegations, Defendants' communications to/from the DOS regarding Plaintiff's services are relevant in this matter. One of the primary issues in this case is whether Defendants breached the MSA. In terminating the parties' relationship, Defendants allegedly relied on Article 12 of the MSA, which allowed Defendants to terminate the MSA based on the DOS's directions. Plaintiffs assert too that Defendants have already produced email communications establishing Plaintiff's need for Defendants' communications to/from the DOS [*See* Doc. 57 p. 5 (explaining that "Defendants have already produced multiple emails that specifically reference communications with DoS that are recognized as implicating Defendants' legal obligations to RSLS under the MSA")]. The Court therefore finds that Plaintiff's discovery requests seeking Defendants' communications to/from the DOS regarding Plaintiff's services (i.e., housing services and life support services) relevant in this matter. Indeed, Defendants have somewhat conceded this point [Doc. 52 p. 9 ("[O]nly a small subset of those communications—

13

those related to the substitution of contractors for securing house—may be relevant to this dispute.")].

Yet, Defendants argue that the discovery requests are not proportional to the needs of this case. Defendants rely on McIntyre's Declaration:

> 11. It would also require a substantial expenditure in resources and time for Defendants to comply with [Plaintiff's] discovery requests, which seek all communications with DOS over a two-year period.
>
> 12. Defendants communicated extensively with DOS regarding the Somalia Task Order during that two-year span, which means thousands of communications would be implicated. I directed the IT department to search the mailboxes of three custodians involved with the Somalia Task Order for records that contain a DOS email domain address (e.g., @state.gov) between January 1, 2019, and December 31, 2020. The search returned 77,328 hits, constituted more than 40GBs of data, even before the documents are produced. We cannot provide a precise estate of the number of these hits that relate to the Somalia Task Order but can confirm it is in the tens of thousands. Moreover, Defendants anticipate they will need to collect documents from additional custodians, which will meaningful increase the number of documents to be searched.

[Doc. 49-7 ¶¶ 11–12].[6] This information persuades the Court that some of the discovery requests appear to be overly broad [*See, e.g.*, Doc. 42-2 p. 3 (RFP No. 2 requesting all communications for two years relating to the Somalia Task Order)].

Despite their assertions of undue burden, Defendants "do not contest that a narrowly-tailored request for some communications with DOS could contain properly discoverable materials" [Doc. 52 p. 12; *see also* Doc. 49 p. 13 n.8 ("RFP No. 11 is much closer to an appropriate tailored document request.")]. It appears from the parties' filings, however, that they have not

---

[6] Defendants also repeat its argument that Plaintiff could issue a subpoena to the DOS, which would entail no burden on Plaintiff [Doc. 52 p. 11]. But Plaintiff is not required to issue a subpoena to a non-party in order to discover documents that a party possesses. *Baumer v. Schmidt*, 423 F. Supp. 3d 393, 408 (E.D. Mich. 2019) (explaining that courts repeatedly quash "subpoenas directed to non-parties where the discovery sought was obtainable from a party to the litigation").

engaged in specific discussions in an attempt to discover what Plaintiff needs to prosecute its case [*See* Doc. 57 p. 7 (arguing that Defendants should have requested or proposed a more narrowly tailored revision of Plaintiff's requests)]. To the extent Defendants have objected to Plaintiff's discovery requests as overly broad (i.e., RFP Nos. 2, 3, 17 and Interrogatory Nos. 1 & 2), the Court **ORDERS** the parties to participate in a meet and confer **within fourteen (14) days** to discuss the specific documents Plaintiff seeks in response to the discovery requests and what appropriate parameters can be put into place to avoid undue expense and burden. Should they arrive at an impasse, they may contact chambers to schedule a hearing. To the extent Defendants have objected solely based on the confidentiality provision (i.e., RFP Nos. 1 & 11 and Interrogatory 10), the Court **ORDERS** Defendants to produce the requested documents within **thirty (30) days** of entry of the protective order [*see supra* Section II.A.].[7]

### III. CONCLUSION

For the reasons explained above, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion to Compel [**Doc. 42**] and **DENIES** Defendants' Motion for Protective Order [**Doc. 49**].

**IT IS SO ORDERED.**

ENTER:

*Jill E. McCook*
Jill E. McCook
United States Magistrate Judge

---

[7] Should the Court determine that some material must be produced, Defendants request that the DOS be afforded an opportunity to be heard concerning any documents Defendants may identify for production [Doc. 49 p. 14]. Under the circumstances of this case, the Court finds thirty (30) days from entry of the protective order sufficient time to advise the DOS of the Court's ruling and for the DOS to be heard on any documents Defendants identify for production. To the extent thirty (30) days is insufficient, Defendants may seek leave for additional time but must meet and confer with Plaintiff prior to seeking an extension.