UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| R.S. LOGISTICAL SOLUTIONS, LTD, | ) | |
| | ) | |
| | ) | 3:21-CV-00178-DCLC-JEM |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JANUS GLOBAL OPERATIONS, LLC, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants Janus Global Operations, LLC ("JGO"), and Caliburn International, LLC ("Caliburn"), ask the Court to dismiss Plaintiff R.S. Logistical Solutions, Ltd's ("RSLS") claims for breach of contract as to violation of a confidentiality provision, tortious inducement of breach of contract, and misappropriation of trade secrets in RSLS's Amended Complaint [Doc. 94] because RSLS did not allege facts sufficient to support those claims under Federal Rule of Civil Procedure 12(b)(6). Unsurprisingly, RSLS opposes Defendants' request [Doc. 113] and maintains the sufficiency of the claims in its Amended Complaint. Defendants reply [Doc. 118] that RSLS's allegations do not rise above speculation.

This matter is now ripe for resolution. Because the Amended Complaint contains sufficient factual allegations and the Court must construe those allegations in RSLS's favor, RSLS has stated claims for misappropriation of trade secrets and tortious inducement of breach of contract. But RSLS's Amended Complaint does not allege facts sufficient to sustain its breach-of-contract claim as to Defendants' alleged violation of a confidentiality provision. Accordingly, Defendants' partial Motion to Dismiss [Doc. 94] is **GRANTED IN PART** and **DENIED IN PART**.

1

# I.    BACKGROUND

Plaintiff RSLS is an Israeli limited liability company that provides logistical and life-support services as a subcontractor on government projects [Doc. 92, ¶ 5].  Defendant JGO is a Delaware limited liability company with a principal office in Lenoir City, Tennessee [*Id.*, ¶ 6].  JGO provides management services to government agencies operating around the world and serves as a prime contractor on projects for the federal government [*Id.*].  Defendant Caliburn, also a Delaware limited liability company and based in Reston, Virginia, operates as a holding company for JGO and Sallyport Global Holdings ("Sallyport") [*Id.*, ¶ 7].

In April 2019, the U.S. Department of State issued the "Somalia Task Order" ("STO") in which it sought bids for a "secure residential compound and associated life support services within a 15-minute drive of the International Campus ("IC") at the Mogadishu International Airport ("MIA") compound" in Somalia [*Id.*, ¶¶ 12-13].  At that time, Bancroft Global Development ("Bancroft")[1] was providing those services as a subcontractor to SOC, LLC ("SOC"), which served as the prime contractor [*Id.*, ¶ 13].  JGO began preparing a bid for the STO [*Id.*, ¶ 15].  Initially, JGO requested a quote from Bancroft to continue providing the housing and life-support services specified in the STO [*Id.*].  Bancroft quoted a prohibitively high price for its services, and JGO next requested a quote from RSLS to provide the housing and life-support services [*Id.*].  RSLS provided "a detailed proposal and competitive pricing . . . [for] the required services."  [*Id.*, ¶ 17].

In its quote to JGO, RSLS proposed "the SKA Home Lodge" as the location for the secure residential compound [*Id.*, ¶ 18].  SKA Somalia ("SKA") owned the SKA compound and partnered with RSLS for work in the area [*Id.*].  Because its partnership with SKA was new and sensitive,

---

[1]    Specifically, the housing and life-support services were provided by Indian Ocean Properties, which is an entity owned by Bancroft and referenced synonymously with Bancroft [Doc. 92, ¶ 13].

RSLS cautioned JGO "to exercise discretion with respect to SKA because it was a relatively young, strategic relationship that RSLS was cultivating . . . in Somalia." [*Id.*]. To that end, RSLS and JGO executed a non-disclosure agreement ("NDA") "to prevent unnecessary disclosure of SKA as the secured housing provider in its subcontractor proposal." [*Id.*, ¶ 22]. Randy Leonard, JGO's project manager for the STO, emailed RSLS and accepted its proposal [*Id.*, ¶¶ 20-21].

JGO submitted a bid as a prime contractor and included RSLS's quote in its bid to the State Department [*Id.*, ¶¶ 17, 24]. SOC also submitted a competitive bid on the STO [*Id.*, ¶ 24]. Ultimately, the State Department selected JGO as the prime contractor for the STO [*Id.*, ¶ 28]. SOC then unsuccessfully protested the award [*Id.*, ¶ 30].[2] JGO defended against SOC's protest with RSLS's help, and the State Department finalized the award of the STO to JGO in December 2019 [*Id.*, ¶¶ 32-34].

While SOC's protest of the award was pending, Mark Warnecki, Caliburn's Vice President for Contracts, tasked Michael Phillips, an administrator for Sallyport, with representing JGO in negotiating the terms of the Master Subcontract Agreement ("MSA") between JGO and RSLS [*Id.*, ¶¶ 39-40]. As negotiations over the final MSA terms were happening, Roy Shaposhnik, RSLS's owner, and Adam Doolittle, RSLS's Chief Strategy Officer, met Leonard for lunch, during which Leonard revealed that Bancroft "submitted a proposal to remain the provider of residential and life support services described in the MSA[.]" [*Id.*, ¶ 41]. Leonard noted that Bancroft's proposal was $6 to $7 million higher than RSLS's quote [*Id.*].

On January 8, 2020, Bancroft contacted Phillips and Leonard to offer a "dramatically reduced price quote for use of [its] facility[.]" [*Id.*, ¶ 50]. That quote "represented a 24% discount"

---

[2] "A bid protest is a challenge to the award or proposed award of a contract for the procurement of goods and services or a challenge to the terms of a solicitation for such a contract." https://www.gao.gov/legal/bid-protests/faqs (last accessed July 18, 2023).

from Bancroft's two previous quotes and "undercut RSLS's pricing by a miniscule amount [such that it] presented an essentially identical quote to that provided by RSLS[.]" [*Id.*, ¶ 52]. According to RSLS, the "timing and precision of [Bancroft's] discounted quote strongly indicates that RSLS's proprietary pricing information had been illicitly provided to [Bancroft] in late 2019 or early January." [*Id.*, ¶ 53]. Bancroft attributed the new quote's lower price to a volume package discount that was not previously offered to JGO [*Id.*, ¶ 54].

In early January 2020, a representative from the State Department asked Thomas Heasley, a Senior Vice President with Caliburn, to travel to Somalia [*Id.*, ¶ 57]. Heasley previously worked for SOC [*Id.*, ¶ 38]. Heasley agreed to travel to Somalia and also travelled to Dubai, United Arab Emirates, to meet with SKA's owner [*Id.*, ¶ 59]. Heasley asked about SKA's commitment to working with RSLS, and SKA's owner informed Heasley that he was committed to working with RSLS [*Id.*, ¶ 60]. After meeting with SKA's owner, Heasley visited the SKA compound in Somalia [*Id.*, ¶ 59].

On January 21, 2020, JGO and RSLS signed the MSA in which RSLS agreed to provide, consistent with the STO requirements, "a secure housing compound complete with apartment units to fully accommodate [JGO's] anticipated staffing requirements over a five-year period." [Docs. 92, ¶ 62; 94-3, pg. 16]. As relevant here, Article 12 of the MSA allowed JGO to terminate "the Agreement or a Purchase Order with or without cause . . . upon written notice." [Doc. 94-3, pg. 16]. JGO agreed not to terminate "for convenience" unless: "1) JGO's customer terminates for convenience, or 2) JGO must terminate Subcontractor in order to avoid a termination for default from JGO's customer in which case the Parties agree to discussions at senior management levels prior to JGO issuing Subcontractor a Termination for Convenience." [*Id.*]. Article 14 of the MSA included a confidentiality provision, requiring that "each Party, unless otherwise agreed to in

writing by the other Party, shall not release information regarding the Work or terms of this Agreement, Purchase Order, or modification of the same . . . to any person other than the disclosing Party's authorized representative" for the purposes of fulfilling the terms of the MSA [*Id.*, pg. 17].

On January 22, 2020, Heasley emailed Leonard and told him that State Department staff in Somalia and the United States' Ambassador to Somalia "had hoped that SOC would win the [STO]." [Doc. 92, ¶ 63]. That same day, a representative from Bancroft emailed JGO again to offer its discounted quote to continue providing housing and life-support services under the STO [*Id.*, ¶ 64]. The next day, Heasley emailed Leonard to express dissatisfaction with the SKA compound and recommend that JGO "not commit to proceeding with its agreement with RSLS [*Id.*, ¶¶ 65-66]. Heasley further directed Leonard to explore "a different housing location," and Leonard obliged, requesting a quote from Bancroft [*Id.*, ¶¶ 67]. Also on that date, JGO asked RSLS to sign the first Purchase Order for the STO [*Id.*, ¶ 68]. After expressing some hesitation, RSLS signed the first Purchase Order [*Id.*, ¶ 71].

On January 24, 2020, Leonard "reminded Heasley that Janus have already signed an agreement with RSLS." [*Id.*, ¶ 72]. Three days later, Leonard asked Heasley and other Caliburn executives to meet with RSLS to discuss terminating the MSA [*Id.*, ¶ 74]. Two days after Leonard's request for Heasley to meet with RSLS, Heasley informed Leonard that JGO would be cancelling the MSA with RSLS and partnering with Bancroft instead to provide services for the STO [*Id.*, ¶ 75]. Heasley explained that State Department officials "were threatening to cancel the [STO] unless the housing solution was changed[.]" [*Id.*]. Because of Heasley's determination that JGO would be working with Bancroft, Leonard sent an email to a representative from Bancroft "expressing his anticipation of working with [Bancroft] for the next five years." [*Id.*, ¶ 76]. RSLS

5

asserts that "substantive discussions/negotiations between [Bancroft] and Defendants began shortly after the denial of SOC's protest[.]" [*Id.*, ¶ 77].

On February 2, 2020, Heasley expressed uncertainty about RSLS's provision of housing to Shaposhnik and asked to schedule a phone call between Caliburn's and RSLS's senior management [*Id.*, ¶ 78]. But that call never occurred [*Id.*, ¶ 81]. Instead, on February 4, 2020, Heasley emailed RSLS a "Termination for Convenience" in which he advised RSLS that JGO was terminating the Purchase Order for convenience [*Id.*, ¶ 82]. RSLS claimed that grounds did not exist to support a termination for convenience under the MSA [*Id.*, ¶ 83]. RSLS considered the email as a "suspension of work" and not a "termination for convenience" [*Id.*].

In response, Sallyport's Procurement Director, Ned Lowry, advised RSLS that he believed senior management from Caliburn and RSLS had spoken already and that the termination for convenience was "based on detailed discussions with [the State Department] wherein we believe we are taking steps to avoid a termination from the customer." [*Id.*, ¶ 84]. Lowry agreed with RSLS's treatment of the email from Heasley as a suspension and not a termination [*Id.*]. Also in early February 2020, another Caliburn executive acknowledged that a meeting between senior management for Caliburn and RSLS had not occurred, and that executive noted that JGO "should not be taking any actions without specific direction from [the State Department] contracting officer." [*Id.*, ¶ 89].

On February 13, 2020, Caliburn advised RSLS by email that the State Department was interested in changing the housing requirement for the project. [*Id.*, ¶ 99]. It informed RSLS that it "was being responsive to [its] customer's interest in evaluating another housing solution." [*Id.*]. On February 21, 2020, RSLS gave JGO written notice that a "full-fledged dispute" existed regarding "JGO's nonperformance of the MSA," and it proposed an informal resolution [*Id.*,

¶ 104].  RSLS asked for a response by March 9, 2020 [*Id.*].  On March 10, 2020, JGO declined RSLS's request for an informal resolution [*Id.*, ¶ 105].

On May 16, 2020, Heasley advised RSLS that "the Department of State modified our Mogadishu WPS contract directing a housing solution consistent with their stated desire vice [sic] our proposed solution."  [*Id.*, ¶ 113].  Heasley did not provide documentation showing the State Department's modification of the STO, and "at no time did Caliburn or [JGO] provide any documentation to substantiate Heasley's representations on May 16[.]"  [*Id.*, ¶¶ 113-15].  RSLS later learned that JGO contracted with Bancroft to provide the residential services for the STO [*Id.*, ¶ 116].  RSLS then filed the instant suit, alleging Defendants' actions cost it approximately $5.5 million in losses [*Id.*, ¶¶ 119-21].

In its Amended Complaint, RSLS brings seven claims.  Count I asserts breach of contract against JGO for denying RSLS the opportunity to take corrective action, failing to follow the requirements for terminating the MSA, and disclosing RSLS's proprietary pricing information "in violation of Article 14 of the MSA."  [*Id.*, ¶¶ 123-34].  Notably, RSLS does not reference the NDA with Defendants as grounds for its breach-of-contract claim.  Count II alleges breach of the implied covenant of good faith and fair dealing against JGO, and Count III alleges anticipatory repudiation also against JGO [*Id.*, ¶¶ 135-46].  Count IV asserts tortious interference with a contract against Caliburn for orchestrating or encouraging JGO to breach the MSA [*Id.*, ¶¶ 147-51].  Count V states tortious inducement of breach of contract under Tenn. Code Ann. § 47-50-109 against Caliburn [*Id.*, ¶¶ 152-56].  Count VI alleges *quantum meruit* against JGO and Caliburn [*Id.*, ¶¶ 157-60].  Lastly, Count VII asserts misappropriation of trade secrets under Tenn. Code Ann. § 47-25-1702(1) against JGO and Caliburn [*Id.*, ¶¶ 161-71].

Defendants now move to dismiss part of Count I and all of Counts V and VII [Doc. 94]. RSLS responded [Doc. 113], and Defendants replied [Doc. 118]. This matter is ripe for resolution

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires the complaint to contain a "short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) eliminates a pleading or portion thereof that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) requires the Court to construe the allegations in the complaint in the light most favorable to the plaintiff and accept all the complaint's factual allegations as true. *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 475 (6th Cir. 1990). The Court may not grant a motion to dismiss based upon a disbelief of a complaint's factual allegations. *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1990). The Court liberally construes the complaint in favor of the opposing party. *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995).

To survive dismissal, the plaintiff must allege facts that are sufficient "to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. Indeed, the Court does not consider whether the plaintiff will ultimately prevail but whether the facts permit the Court to infer more than the mere possibility of misconduct. *Id.* at 679. The court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), and dismissal is appropriate "if it is clear that no relief could be granted under any set of facts that could be proved consistent with

Case 3:21-cv-00178-DCLC-JEM   Document 128   Filed 07/20/23   Page 8 of 16   PageID #: 1080

the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  In addition to the allegations contained in the complaint, a court may consider "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint" in ruling on a Rule 12(b)(6) motion to dismiss. *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001) (citation omitted).

## III. ANALYSIS

### A. Count I – Breach of Contract against JGO

Defendants argue that RSLS does not state a claim for breach of contract for violating the confidentiality provision in the MSA by disclosing RSLS's pricing information [Doc. 94, pg. 20]. Under Tennessee law, "[i]n a breach of contract action, claimants must prove the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Federal Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011).

Defendants assert that Bancroft's own economic interest was the reason it lowered its price rather than obtaining RSLS's pricing information [*Id.*, pgs. 20-21].  Defendants state that the parties had not executed the MSA at the time that they allegedly disclosed RSLS's pricing information, which shows that there was no enforceable contract in place between Defendants and RSLS [*Id.*, pg. 21].  RSLS responds that JGO breached both the confidentiality provisions of the MSA and the NDA the parties signed during the bid process [Doc. 113, pgs. 19-20].  RSLS asserts that the Amended Complaint adequately alleges the existence of the NDA and that the parties executed the NDA on April 5, 2019 [*Id.*, pg. 20].  Defendants reply that RSLS only briefly mentions the existence of the NDA and does not state that it "used or relied on an NDA with respect to its pricing information."  [Doc. 118, pg. 4].  Defendants further note that RSLS knew about the NDA at the outset of this case but did not include it in the alleged breach claim "because it was never intended to serve as the basis for such a claim."  [*Id.*, pgs. 4-5].

9

Here, RSLS cannot state a claim for breach of contract as to the confidentiality provision of the MSA. By RSLS's own allegations, Defendants purportedly disclosed its pricing information to Bancroft sometime between September 2019 and the beginning of January 2020 [Doc. 92, ¶ 53]. But the parties did not execute the MSA until January 21, 2020 [Docs. 92, ¶ 62; 94-3, pg. 16]. Taking the Amended Complaint's factual allegations as true, the confidentiality provision of the MSA did not bind Defendants during their alleged disclosure of RSLS's pricing information. And because the confidentiality provision did not bind Defendants during their alleged disclosure, RSLS has not asserted "the existence of a valid and enforceable contract" as to the breach-of-contract claim related to Article 14 of the MSA. *Winters*, 354 S.W.3d at 291.

Further, RSLS's reliance on its NDA with Defendants is misplaced. RSLS identifies the execution of the NDA as a step that it took to maintain the secrecy of its pricing information, but it does not include the NDA as grounds for its breach-of-contract claim [*See* Doc. 92, ¶¶ 22, 123-34]. RSLS listed the discrete provisions of the MSA that Defendants allegedly breached and did not mention the NDA in that same list [*Id.*, ¶¶ 123-34]. Although RSLS's breach-of-contract claim incorporates the preceding paragraphs of the Amended Complaint, that incorporation serves only to provide background information and support for the specific breaches identified by RSLS [*Id.*, ¶ 123]. RSLS cannot now constructively amend its Amended Complaint in its response to Defendants' partial motion to dismiss. Accordingly, Defendants' partial motion to dismiss is **GRANTED** in this respect.[3]

---

[3]     RSLS argues in the alternative that it should be allowed to amend its Amended Complaint "to detail the timeline and contractual bases for Defendants' breaches." [Doc. 113, pg. 20]. But the proper vehicle for such a request is a motion to amend that provides Defendants the opportunity to respond to RSLS's arguments for amending under the governing legal principles. *See generally* Fed. R. Civ. P. 15(a). Accordingly, the Court declines to address RSLS's request in the alternative absent an appropriate motion.

## B. Count V – Tortious Inducement of Breach of Contract, in violation of Tenn. Code Ann. § 47-50-109

Defendants contend that RSLS cannot state a claim for tortious inducement for breach of contract [Doc. 94, pg. 21]. Tennessee law makes it unlawful for any person, "by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto." Tenn. Code Ann. § 47-50-109. To prevail on a claim for tortious inducement of breach of contract, a plaintiff must show that: (1) there was a legal contract; (2) the defendant knew of the existence of the contract; (3) the defendant intended to induce a breach of the contract; (4) the defendant acted maliciously; (5) the contract was actually breached; (6) the defendant's actions were the proximate cause of the breach; and (7) the plaintiff suffered damages resulting from the breach. *Keith v. Aerus, LLC*, No. 2:09-CV-00297, 2010 WL 3883434, at *4 (E.D. Tenn. Sep. 29, 2010) ("The elements of both a common law claim under Tennessee Law and a statutory claim pursuant to Tennessee Code Annotated § 47-50-109 are the same[.]"). In such cases, the inducing party is liable for treble damages resulting from the breach of the contract. *Id.*

Here, RSLS has pleaded sufficiently a claim for tortious inducement of breach of contract. Specifically, RSLS has alleged that there was a contract between it and JGO, Caliburn knew of the contract's existence, Caliburn intended to induce a breach and acted maliciously, JGO breached the contract, Caliburn's actions caused the breach, and RSLS suffered damages from JGO's breach [Doc. 92, ¶¶ 39-40, 62, 65-66, 75, 78, 119-21].

But Defendants argue that Caliburn was privileged to interfere in JGO's contractual relationship with RSLS. They assert that RSLS did not allege that Caliburn forced JGO to act against its economic interests or that Caliburn employed wrongful means to cause JGO to terminate the MSA [Doc. 94, pgs. 21-22, 24]. Defendants contend that Heasley's emails to

11

Leonard show that the State Department was concerned with the SKA compound and that JGO risked losing the STO because of those concerns [*Id.*, pg. 23]. Defendants note that RSLS does not allege that JGO lost money or suffered from terminating the MSA [*Id.*, pg. 24]. Defendants next argue that RSLS cannot show that Caliburn used wrongful means to cause JGO to terminate the MSA [*Id.*, pg. 25]. Defendants note that RSLS cannot offer an explanation as to why Heasley might have lied about the State Department's reservations regarding the SKA compound [*Id.*].

RSLS responds that Caliburn lost its privilege to interfere with JGO's contractual relationship [Doc. 113, pg. 14]. It contends that Caliburn's inducement of JGO to breach the MSA is contrary to JGO's economic interests to avoid litigation and lost profits [*Id.*, pg. 16]. It notes that Leonard reminded Heasley about JGO's contract with RSLS and that terminating the MSA would be detrimental to JGO's performance on another project [*Id.*, pg. 17]. It further asserts that Defendants have not shown that there was an actual threat of default or a directive from the State Department to change the housing requirements for the STO [*Id.*, pg. 18]. RSLS next argues that Caliburn acted improperly in advising JGO to terminate the MSA by misrepresenting the situation as to whether the State Department wanted to terminate the award of the STO [*Id.*, pgs. 18-19]. It states that there is no evidence that the State Department directed Defendants to look for a new housing solution [*Id.*, pg. 19]. Defendants reply that without Caliburn's alleged interference, JGO would have lost the STO and significant profits and that JGO's relationship with RSLS "actually would have been contrary to JGO's economic interests." [Doc. 118, pgs. 5-6].

To be sure, Tennessee law provides a parent corporation "a privilege pursuant to which it can cause a wholly-owned subsidiary to breach a contract without becoming liable for induce of breach of contract." *Waste Conversion Sys., Inc. v. Greenstone Indus., Inc.*, 33 S.W.3d 779, 781 (Tenn. 2000). That privilege is not absolute, however. A parent corporation loses its privilege to

12

interfere with a subsidiary's contractual relationships if the parent corporation acts contrary to the subsidiary's economic interests or uses "wrongful means." *Id.* at 783–84. Moreover, the parent corporation losses its privilege if it uses "wrongful means" in interfering in the subsidiary's relationship, "even if the parent does not act contrary to the subsidiary's best interests." *Id.* Tennessee law defines "wrongful means" as "misrepresentation of facts, threats, violence, defamation, trespass, restraint of trade, or any other wrongful act recognized by statute or common law." *Id.* (internal quotations and citations omitted).

The Amended Complaint shows that Heasley, then employed as a Senior Vice President for Caliburn, indicated early on in the professional relationship between RSLS and JGO that JGO intended to cancel the MSA with RSLS [Doc. 92, ¶ 63]. Heasley continued to express Caliburn's intent to terminate the MSA with RSLS, even after Leonard "reminded Heasley that [JGO] have already signed an agreement." [*Id.*, ¶¶ 72, 75]. Although Heasley relayed the State Department's alleged displeasure with the SKA compound, neither Heasley nor anyone else at Caliburn or JGO provided documentation to support the State Department's supposed change of the housing requirements for the STO [*Id.*, ¶¶ 113-15]. Caliburn executives did know, however, not to take "any actions without *specific direction* from [the State Department] contracting officer." [*Id.*, ¶ 89] (emphasis added). But Heasley appears to be the only person privy to the State Department's perception of the SKA compound and failed to offer the "*specific direction*" that would corroborate his claims about the State Department's shifting attitude toward RSLS's housing solution [*Id.*] (emphasis added). Heasley's, and by extension Caliburn's and JGO's, purported duplicity in encouraging RSLS to sign the MSA and the first Purchase Order while actively engaging with Bancroft and telling other JGO's employees that it would terminate the MSA with RSLS qualifies as a "misrepresentation of facts." *Id.*

13

Those allegations, taken together and construed in favor of RSLS at this stage of litigation, show that RSLS adequately pleaded Caliburn's loss of privilege to interfere in JGO's contractual relationship with RSLS through the use of "wrongful means." *See id.* Thus, RSLS's Amended Complaint passes the relatively low hurdle for pleading a claim sufficiently to survive a motion to dismiss. *See Miller*, 50 F.3d at 377 (holding that a district court must liberally construe the complaint in favor of the opposing party at the motion to dismiss stage). Accordingly, Defendants' partial motion to dismiss is **DENIED** in this respect.[4]

### C. Count VII – Misappropriation of Trade Secrets, in violation of Tenn. Code Ann. §§ 47-25-1702(1)

Defendants contend that RSLS does not state a claim for misappropriation of trade secrets under Tennessee law [Doc. 94, pg. 17]. The Tennessee Uniform Trade Secrets Act ("TUTSA") provides a cause of action for the misappropriation of trade secrets by a person. Tenn. Code Ann. §§ 47-25-1703, 1704. The Act defines misappropriation as

> (A) [a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) [d]isclosure or use of a trade secret of another without express or implied consent by a person who: (i) [u]sed improper means to acquire knowledge of the trade secret; or (ii) [a]t the time of disclosure or use, knew or had reason to know that that person's knowledge of the trade secret was: . . . (b) [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use[.]

*Id.* § 47-25-1702(2). The Act further defines "[i]mproper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or limit use, or espionage through electronic or other means." *Id.* § 47-25-1702(1). To establish a claim for misappropriation under TUTSA, a plaintiff must show: (1) the existence of a trade secret; (2) the

---

[4]     Because Caliburn may lose its privilege by using wrongful means "even if [it] d[id] not act contrary to [JGO's] best interests[,]" the Court need not address the parties' arguments regarding JGO's economic interests. *Waste Conversion Sys., Inc.*, 33 S.W.3d at 783–84.

misappropriation of that trade secret by the defendant; and (3) resulting detriment to the plaintiff. *See ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 962 (M.D. Tenn. 2011).

Defendants argue that the Amended Complaint does not contain factual allegations to support RSLS's assertion that they disclosed RSLS's pricing information to Bancroft [Doc. 94, pg. 19]. Defendants assert that the timing and circumstances of Bancroft's price reduction show that Bancroft was motivated by "economic self-interest" rather than because of RSLS's pricing information [*Id.*]. Defendants note that Bancroft reducing its price was a natural reaction to Defendants winning the STO [*Id.*]. RSLS responds that its factual allegations identify the steps it took to maintain secrecy of its pricing information and JGO's misappropriation of its pricing information by disclosing that information to Bancroft [Doc. 113, pg. 9]. RSLS asserts that it has identified the trade secrets at issue as its pricing information and that it was injured by the alleged disclosure of that information to Bancroft [*Id.*, pgs. 10-11]. It argues that Defendants obtained RSLS's pricing information during the bid process and were required to keep that information confidential under the NDA the parties signed [*Id.*, pg. 12]. RSLS contends that the timing and "precision" of Bancroft's lowered price indicates that Defendants gave Bancroft RSLS's price information to persuade Bancroft to lower its prices [*Id.*, pg. 13].

Defendants reply that RSLS has not alleged facts that show they did anything improper [Doc. 118, pgs. 1-2]. They contend that RSLS's allegations are speculative and conclusory [*Id.*]. Defendants note that RSLS does not allege "any conversation, phone call, email, text message, or other such communication where such an allegedly improper disclosure transpired." [*Id.*, pg. 3].

Here, RSLS sufficiently pleaded facts to establish a claim for misappropriation of trade secrets under the TUTSA. The Amended Complaint identifies RSLS's pricing information as a trade secret that RSLS took pains to keep confidential by executing an NDA with Defendants and

15

including a confidentiality provision in the MSA [Doc. 92, ¶¶ 22, 52; 94-3, pg. 17]. The Amended Complaint states that Bancroft contacted Defendants multiple times after they won the STO to offer them a quote for its services but that those quotes remained higher than RSLS's quote [*Id.*, ¶¶ 41, 50, 64]. The Amended Complaint also states that Bancroft finally offered its lowest price quote after Defendants indicated to RSLS that they were communicating with Bancroft about residential and life-support services [*Id.*, ¶¶ 52-53].

Moreover, emails between Defendants' employees show that they were contemplating working with Bancroft soon after they successfully defeated SOC's bid protest [*Id.*, ¶¶ 41, 50, 65-66]. To be sure, Heasley directed Leonard not to commit to proceeding with RSLS and asked him to explore "a different housing location," which Leonard took to mean requesting a quote from Bancroft [*Id.*, ¶¶ 67, 75-76]. And Bancroft's lowest price quote for its service only slightly undercut RSLS's quote that Defendants initially accepted [*Id.*, ¶ 52]. Those facts—taken together at this stage of litigation—sufficiently show the existence of RSLS's trade secret, Defendants' misappropriation of that trade secret through disclosure to Bancroft, and a resulting harm to RSLS. *See ProductiveMD, LLC*, 821 F. Supp. 2d at 962. Defendants' partial motion to dismiss is **DENIED** in this respect.

## IV. CONCLUSION

For the reasons stated herein, Defendants' Motion to Dismiss [Doc. 94] is **GRANTED IN PART** and **DENIED IN PART**. RSLS's claim for breach of contract as to the confidentiality provision in Article 14 of the MSA is **DISMISSED**.

**SO ORDERED**:

s/ Clifton L. Corker
United States District Judge

16